**[Cite as *In re M.J.*, 2015-Ohio-127.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## GREENE COUNTY

IN THE MATTERS OF: M.J. and J.J.

Appellate Case Nos. 2014-CA-32 and
2014-CA-33

Trial Court Case Nos. S44220 and S43007

(Appeal from Domestic Relations Court)

. . . . . . . . . . .

# O P I N I O N

Rendered on the 16th day of January, 2015.

. . . . . . . . . . .

BRITTANY M. HENSLEY, Atty. Reg. No. 0086269, Assistant Greene County Prosecuting Attorney,
Counsel for Greene County Children Services, 55 Greene Street, First Floor, Xenia, Ohio 45385
        Attorney for Plaintiff-Appellee

JENNIFER GETTY, Atty. Reg. No. 0074317, 46 East Franklin Street, Dayton, Ohio 45459
        Attorney for Appellee - A.H.

MARCY A. VONDERWELL, Atty. Reg. No. 0078311, 120 West Second Street, Suite 333, Dayton,
Ohio 45402
        Attorney for Appellant - C.J.

JOAN ACKERMAN, c/o Greene County Juvenile Court, 2100 Greene Way Boulevard, Xenia, Ohio
45385
        Guardian Ad Litem

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1}      Appellant, C.J., the biological father of J.J. and M.J., appeals from a judgment terminating his parental rights to the children.  The biological mother, A.H., has not appealed from the judgment terminating her parental rights.

{¶ 2}    In support of his appeal, C.J. contends that the judgment that he abandoned his children is against the manifest weight and sufficiency of the evidence.  C.J. also contends that the judgment that the children could not be placed with him within a reasonable period of time is against the manifest weight of the evidence.  Finally, C.J. contends that granting permanent custody to Greene County Children Services (GCCS) is not in the best interests of the minor children.

{¶ 3}    We conclude that the judgment of the trial court granting permanent custody of the children to GCCS is not against the manifest weight of the evidence, is supported by clear and convincing evidence, and is in the best interests of the children.   Accordingly, the judgment of the trial court will be affirmed.


I.   Facts and Course of Proceedings

{¶ 4}    In April 2011, GCCS filed a dependency complaint in juvenile court, alleging that J.J., who was born in February 2011, lacked adequate care because of the mental or physical condition of her parents, A.H. and C.J.  The complaint alleged that GCCS had been involved with the parents previously, when their older child had been placed with the child's maternal grandmother.

{¶ 5}      According to the complaint, J.J. had tested positive for marijuana when she was

born, and A.H. admitted to having used marijuana throughout her pregnancy. After receiving a referral, GCCS attempted a safety plan, with A.H. and the baby living with the alleged paternal great-grandfather, and A.H. working with the agency. The plan was unsuccessful, and A.H. agreed to place J.J. in foster care. At the time, A.H. claimed that she did not know the whereabouts of the child's father, C.J. In June 2011, the court found that the child was dependent, and awarded temporary custody to GCCS.

{¶ 6} Because A.H. expressed little to no interest in working with GCCS or completing a case plan, A.H. was removed from the plan and the child was placed with her maternal grandfather in November 2011. By that time, A.H. had tested positive for marijuana on three random drug screens. In March 2012, the court awarded legal custody to the grandfather, B.H., noting that A.H. had not had contact with the child since the spring of 2011.

{¶ 7} On August 5, 2012, A.H. gave birth to another child (M.J.), who had also been fathered by C.J. On August 7, 2012, GCCS requested an emergency order of custody of M.J., alleging that there were reasonable grounds to believe M.J. was in immediate danger from his surroundings. The court issued an order the same day, granting emergency custody of M.J. to GCCS. GCCS then filed a dependency complaint on August 8, 2012, based on the fact that A.H. was currently residing at the Family Violence Protection Center due to a history of abuse by C.J. Although A.H. denied having contact with C.J., he had been at the hospital on August 6 and 7, and A.H. planned to have C.J.'s mother transport her from the hospital to the shelter. According to the shelter, A.H. had demonstrated a history of non-compliance with the shelter's requirements.

{¶ 8} On August 21, 2012, the juvenile court granted interim custody of M.J. to GCCS.

A case plan was developed, which required A.H. to obtain stable housing apart from C.J., and to comply with other requirements, including submitting to random drug screens, continuing counseling, and so forth. M.J. was placed in foster care, and A.H. was permitted visits under supervision at the Family Violence Prevention Center due to concerns over C.J.'s prior domestic violence. The court then set an adjudicatory hearing for October 2, 2012.

{¶ 9} On September 17, 2012, an amended case plan was filed, indicating that A.H. had obtained her own apartment, and visitation would be permitted at the apartment. Subsequently, on September 28, 2012, A.H. filed a motion for emergency custody of J.J. She noted in the motion that her father, B.H., who had custody of J.J., was homeless and had placed J.J. in her care a month earlier. A.H. also indicated that she was starting school in two weeks and needed to enroll J.J. in daycare. She included C.J.'s address, and indicated that he was subject to a protection order that the domestic relations court had issued in 2012.

{¶ 10} On October 3, 2012, by agreement of GCCS and A.H., the court returned custody of M.J. to A.H., with protective supervision to GCCS. At the time, A.H. was enrolled in college, had completed the "Moms" program at the Women's Center, had moved to her own two-bedroom apartment, and had received a mental health assessment. Subsequently, on October 15, 2012, the court gave A.H. interim custody of J.J., and again granted GCCS protective supervision. At the time, A.H. tested negative for any illegal drug use. The father, C.J., was in court at that time.

{¶ 11} In November 2012, GCCS filed an amended case plan, including C.J., and adding services and requirements for him. According to the plan, C.J. had been in and out of jail for probation violations, had a history of drug abuse, and had no stable living environment or income. Both parents were required to comply with the civil protection order, submit to random

drug screens, obtain counseling, and not engage in domestic violence. The amended case plan was approved, and the court returned legal custody of J.J. to the mother, with GCCS maintaining protective supervision.

{¶ 12} Subsequently, on January 16, 2013, GCCS obtained an emergency order of custody for J.J. and M.J. GCCS then filed a complaint on January 17, 2013, alleging that the children were dependent pursuant to R.C. 2151.04(C). According to the complaint, A.H. had called the agency on January 16, 2013, to report that she had been offered a modeling job for a magazine in Las Vegas and would be leaving with the children the next day. Reportedly, the magazine was furnishing her with a four-bedroom house, a nanny, and a car. After receiving a release to speak to the employer, a "Mr. Fine" of *Virtually Beautiful Magazine*, GCCS was unable to confirm A.H.'s potential address and the details of her employment. Upon researching the magazine, GCCS found a website containing nude pictures and references to exotic aquatic pool parties.

{¶ 13} The complaint further alleged that upon obtaining ex parte custody, a caseworker went to A.H.'s house to obtain the children. A.H. was not home, and the children were being cared for by an uncle and friend, who expressed concern about the children because the mother was never home. Contrary to what the caseworker had been told, the mother was working at a dance club, where she had met Mr. Fine.

{¶ 14} There were also concerns about violation of the protection order. C.J. had been arrested on January 8, 2013, for violating the protection order, and was in the Greene County Adult Detention Center. C.J. told the caseworker that he had seen A.H. over a hundred times (in violation of the order).

{¶ 15} On January 22, 2013, the juvenile court filed an entry granting interim custody to GCCS. A.H. was ordered to have a drug screen, and tested positive for marijuana and benzodiazepines. The children were placed in foster care, and an adjudicatory hearing was scheduled for March 15, 2013. An amended case plan was filed, giving A.H. restricted and supervised visits, and again requiring A.H. to comply with various requirements, including counseling, random drug screens, and so forth. At the time, C.J. was still in jail.

{¶ 16} Neither parent appeared at the March adjudicatory hearing, despite having been notified. The children were adjudicated dependent, and GCCS was given temporary custody. An amended case plan was filed in March 2013, listing reunification as the goal. The plan did not list visitation for C.J., but GCCS indicated it would help facilitate visits for C.J. if the civil protection order or the court allowed visits.

{¶ 17} A.H. visited the children sporadically, and did not visit them at all between May 8, 2013 and January 27, 2014, despite repeated attempts by GCCS to involve her. A semi-annual review filed in August 2013 indicated that C.J. was again in jail and had felony charges for violating the protection order. He had also been diagnosed with bipolar disorder in April 2012 and was not taking any medication.

{¶ 18} On September 11, 2013, the GCCS caseworker in charge of the case, Krista V., accidentally encountered A.H. and C.J. together near the courthouse on the day that C.J. had been released from jail. Krista asked A.H. if she wanted to work on reunification, and after some hesitation and arguing, A.H. agreed to come into the agency. A.H. refused to give the caseworker an address, however. A.H. came into the agency and the case plan was updated. The following week, A.H. asked about visitation, and Krista told her it would take some time to process. When

Krista attempted to reach A.H. the following week, the number A.H. had given her was disconnected, and GCCS was unable to contact A.H. The agency was also unable to reach C.J. Both parents tested positive for marijuana in September 2013.

{¶ 19} On November 4, 2013, GCCS filed a motion requesting modification of temporary custody to permanent custody. The motion noted that A.H. had not seen the children since May 2013, and had not kept in contact with the agency to schedule visitation. The motion also noted that C.J. had not been able to visit the children due to a protection order that had been in effect from August 2012 to August 2013. However, after being released from jail in September 2013, C.J. had not engaged in case plan activities and had not kept in contact with GCCS in order to schedule visitation.

{¶ 20} On November 13, 2013, GCCS filed an amended case plan, adding restricted and supervised visitation for C.J. The plan indicated that C.J. would need to meet certain requirements before visitation could begin, including meeting with a caseworker to establish a schedule, and starting case plan services. The same requirements pertained to A.H.

{¶ 21} C.J. and A.H. did not contact GCCS until mid-December 2013, when they came together to the agency to ask about visitation. Visitation for A.H. and C.J. began on January 27, 2014, when they saw the children. However, two days later, on January 29, 2014, C.J. was arrested for domestic violence and was incarcerated between then and April 28, 2014. A.H. saw the children five times between January 29, 2014, and March 3, 2014, and did not schedule visitation thereafter. A.H. also did not participate in her case plan.

{¶ 22} On January 3, 2014, the court scheduled a permanent custody hearing for March 11, 2014, and appointed a guardian ad litem for the children (GAL). The GAL's preliminary

report, filed on January 28, 2014, recommended that the court award permanent custody to GCCS. The GAL then filed a report and recommendation on March 5, 2014, indicating that the parents had lived together for about a month before C.J.'s most recent arrest for domestic violence and driving under suspension. A.H. was reportedly pregnant with the father's fourth child. In addition, C.J. had a history of mental health, drug, and legal issues dating to his early teenage years. The GAL noted that despite repeated attempts by GCCS, the parents had not been able to complete the goals established by the court and their case plan, and had not shown a consistent interest in visitation. Further, the children were thriving in foster care. The GAL, therefore, recommended that permanent custody be awarded to GCCS.

{¶ 23} The custody hearing was continued until May 28, 2014. In the meantime, C.J. was released from jail on April 28, 2014. After being released from jail, C.J. had three visits with the children. He also had followed up on his medication at TCN, but had missed appointments on May 15, 19, and 21, 2014, with his case managers there. He was also attending a dual-diagnosis group, which met weekly.

{¶ 24} A.H. did not appear at the hearing, although she was represented by counsel. GCCS presented evidence at the hearing from the various caseworkers who had worked on the case, and from the foster mother, who indicated that the children were doing very well in her care, and that she wished to adopt the children if GCCS were granted permanent custody. M.J. had been in her care since birth, other than the three months that A.H. had custody, and J.J. had been in her care since January 2013.

{¶ 25} C.J. also testified at the hearing. He stated that he had obtained two jobs in the two weeks before the hearing, for which he was being paid under the table. None of his money

had gone towards the support of the children. In fact, C.J. had never supported the children in any way since their birth.

{¶ 26} C.J. also indicated that he was supposed to be living with his grandmother. However, he stated at the custody hearing that he had been "roughing" it lately, staying at a cousin's, as well as his grandmother's, and had slept in a park. In addition, C.J. had tested positive for marijuana the previous week, and admitted he would likely test positive again on the day of the custody hearing. Furthermore, C.J. also testified that he had seen A.H. the previous week at an event called "Cruise Fest," and that they had intercourse.

{¶ 27} After hearing the evidence, the trial court filed a judgment on June 12, 2014, granting permanent custody of J.J. and M.J. to GCCS. In its decision, the trial court concluded that both parents had abandoned the children, and that despite reasonable case planning and diligent efforts by the agency, C.J. had continuously and repeatedly failed to remedy the conditions causing the children to be placed outside the home. The court further concluded that the children could not be placed with either parent within a reasonable period of time, and that there were no suitable relative placements available.

{¶ 28} C.J. now appeals from the judgment awarding permanent custody of the children to GCCS. As was noted, A.H. has not appealed from the court's decision.


II.

{¶ 29} C.J.'s First Assignment of Error states that:

> The Judgment of the Trial Court That Father Abandoned the Minor
> Children Was Against the Manifest Weight and Sufficiency of the Evidence.

{¶ 30}     Under this assignment of error, C.J. contends that GCCS did not present sufficient evidence that the children were abandoned.  The trial court concluded that C.J. had abandoned the children by failing to visit them between January 2013 and January 2014.  C.J. argues, however, that he rebutted the presumption of abandonment because GCCS refused to set up visitation.

{¶ 31}     As pertinent here, R.C. 2151.414(B)(1) states that:

* * * [T]he court may grant permanent custody of a child to a movant if the court determines, * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody to the agency that filed the motion for permanent custody and that any of the following apply:

(a) the child is not abandoned or orphaned or has not been in the custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) the child is abandoned.

{¶ 32}   With respect to abandonment, R.C. 2151.011(C) provides that:

For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.

{¶ 33}     The presumption of abandonment under R.C. 2151.011(C) is rebuttable.  *See In*

*re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, ¶ 12, citing *In re Cornell*, 11th Dist. Portage No.2003-P-0054, 2003-Ohio-5007, fn. 2; and *In re Phillips*, 11th Dist. Ashtabula No. 2005-A-0020, 2005-Ohio-3774, ¶ 32.

{¶ 34} With respect to challenges based on manifest weight and sufficiency of the evidence, the Tenth District Court of Appeals has noted that:

> In determining whether the trial court's ruling on the permanent custody motion is against the manifest weight of the evidence, we must consider whether the evidence on each element of the agency's case "satisfied or failed to satisfy the burden of persuasion," i.e., whether clear and convincing evidence supports each element. *See Sparre v. Ohio Dept. of Transp.*, 10th Dist. No. 12AP-381, 2013-Ohio-4153, ¶ 11, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 19. A judgment " 'supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence.' " *Id*. at ¶ 10, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus. " 'The phrase "some competent, credible evidence" * * * presupposes evidentiary weighing by an appellate court to determine whether the evidence is competent and credible.' " (Emphasis sic.) *Id.*, quoting *Eastley* at ¶ 15.

*In re C.G.*, 10th Dist. Franklin Nos. 13AP-632, 13AP-653, 2014-Ohio-279, ¶ 30.

{¶ 35} After making these comments, the Tenth District Court of Appeals further commented that:

> " 'Weight of the evidence concerns "the inclination of the greater amount

of credible evidence, offered in a trial, to support one side of the issue rather than the other. * * * Weight is not a question of mathematics, but depends on [the evidence's] effect in inducing belief." ' " (Emphasis deleted.) *Eastley* at ¶ 12, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "Thus, in reviewing a judgment under the manifest-weight standard, a court of appeals weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *Sparre* at ¶ 10, citing *Eastley* at ¶ 20.

"In undertaking this limited reweighing of the evidence, however, we are guided by the presumption that the factual findings of the trial court were correct." *Sparre* at ¶ 12. "Accordingly, the weight to be given the evidence and the credibility of the witnesses are primarily questions to be answered by the trier of fact." *Id.*, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The rationale for this deference is the trier of fact is in the best position to view witnesses and observe their demeanor, voice inflections, and gestures. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). Moreover, though sufficiency and manifest weight are different legal concepts, a finding that a judgment is supported by the manifest weight of the evidence necessarily includes a finding that sufficient evidence supports the judgment. *See State v. Howze*, 10th Dist. No. 13AP-386, 2013-Ohio-4800, ¶ 10.

*C.G.* at ¶ 31-32.

**{¶ 36}** After reviewing the evidence, we conclude that the trial court's decision on abandonment was not against the manifest weight of the evidence, and was supported by clear and convincing evidence.

**{¶ 37}** Although C.J. was in jail during parts of 2013, he was released from jail on September 11, 2013. The protection order had also expired by that time, and C.J. would have been entitled to see his children, regardless of the content of the order. However, C.J. did not seek visitation with his children until mid-December 2013, a period of more than ninety days. Unlike the mother in *Custody of C.E.*, C.J. had no valid reason for failing to maintain contact with the children. Specifically, the mother in that case did not contact her children in order to avoid the substantial possibility that her location would be disclosed to her physically abusive husband. *Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913, at ¶ 15. In *Custody of C.E.*, we stressed that there was no evidence contradicting the mother's testimony about her reason for failing to contact the children. *Id.*

**{¶ 38}** Furthermore, even after C.J. established contact on January 27, 2014, he voluntarily committed acts, i.e., domestic violence, that caused his return to jail, and disrupted his contact with the children for another 90-day period. The other acts that caused C.J. to be incarcerated between at least April and September 2013 (during which time he also did not see the children), were also voluntary.

**{¶ 39}** Moreover, the fact that C.J. visited with the children after he was released from jail in late April 2014 does not negate the presumption of abandonment. As was noted in the case of *In re D.P.*, 10th Dist. Franklin No. 06AP-780, 2007-Ohio-1703, "R.C. 2151.011(C) clearly indicates that it is immaterial whether the parent resumes contact with the child after the period of

abandonment." *Id.* at ¶ 7, citing *In re Cravens*, 3d Dist. Defiance No. 4-03-48, 2004-Ohio-2356, ¶ 23.

**{¶ 40}** C.J. relies on *In re N.C.P.*, 5th Dist. Stark No. 2014CA00083, 2014-Ohio-3694, in support of the proposition that if a parent attempts to visit but is prevented from doing so by the agency, "it would be difficult to prove that the parent's actions were the equivalent of abandonment." Brief of Appellant, C.J., p. 8. We agree that the Fifth District Court of Appeals did make such a statement in *N.C.P. See, id.* at ¶ 27, citing *In re Adoptions of Groh*, 153 Ohio App.3d 414, 424, 794 N.E.2d 695 (7th Dist.2003). Notably, however, the court of appeals did not find that the agency had interfered with visitation in *N.C.P.* Likewise, there is no evidence in the case before us that GCCS interfered with C.J.'s attempts to visit his children.

**{¶ 41}** Instead, C.J.'s own actions caused a different court to issue a protection order against C.J. in August 2012. In November 2012, GCCS added C.J. to the case plan, and required him to do certain things, including abiding by the rules of his probation and the protection order, and not engaging in domestic violence incidents. Instead of doing so, C.J. admitted violating the protection order, and ended up in jail again shortly thereafter, from January to March 2013.

**{¶ 42}** Furthermore, despite having been notified of the adjudicatory hearing on March 15, 2013, and having been released from jail, C.J. failed to appear for the hearing. A few days after the hearing, GCCS filed an amended case plan, indicating that the agency would help facilitate visitation between C.J. and the children if the protection order or the court allowed visitation. Instead of taking steps to obtain visitation, C.J. again violated the civil protection order and was incarcerated from April to September 2013. Once visitation was established in January 2014, C.J. again committed domestic violence and was incarcerated for several more

months.   Thus, any lack of visitation was not the fault of GCCS.

{¶ 43}   Accordingly, the judgment that the children were abandoned is not against the manifest weight of the evidence, and is supported by clear and convincing evidence.   The First Assignment of Error, therefore, is overruled.

### III.   Placement of Children Within a Reasonable Time

{¶ 44}   C.J.'s     Second     Assignment     of     Error     states     that:

The Judgment of the Trial Court That the Children Could Not Be Placed With the Father Within a Reasonable Period of Time Was Against the Manifest Weight of the Evidence.

{¶ 45}   Under this assignment of error, C.J. contends that the trial court erred in concluding that the children could not be placed with him within a reasonable period of time.   In this regard, C.J. notes that he was able to follow through with services when he was incarcerated, and that after his latest release from jail, he was cooperating with his treatment and had secured employment.   C.J. further points to his testimony that the children could stay with his grandmother.

{¶ 46}   We have already concluded that the trial court did not err in finding that C.J. had abandoned the children.   Since this finding would permit the court to conclude that a grant of permanent custody to GCCS was appropriate, we are not required to address the remaining ground for terminating parental rights.   However, even if we were required to consider the matter, we would find the alleged error without merit.

{¶ 47} As was noted, R.C. 2151.414(B)(1)(a) provides an alternate ground for awarding permanent custody to an agency, where "the child is not abandoned or orphaned or has not been in the custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."

{¶ 48} Under R.C. 2151.414(E), "[t]he court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents." *N.C.P.*, 5th Dist. Stark No. 2014CA00083, 2014-Ohio-3694, at ¶ 31. "A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time." *Id.*, citing *In re William S.*, 75 Ohio St.3d 95, 661 N.E.2d 738 (1996). (Other citations omitted.) *See, also, In re Gau*, 2d Dist. Montgomery No. 18630, 2001 WL 523963, *6 (May 18, 2001), and *In re B.G.W.*, 10th Dist. Franklin No. 08AP-181, 2008-Ohio-3693, ¶ 11 (both citing *William S.*).

{¶ 49} In concluding that the children could not be placed with C.J. within a reasonable time, the trial court noted that C.J. had failed to remedy the conditions that caused the children to be removed from the home, and that his stated intent to now comply with case plan activities was belied by his continued use of marijuana and his continued involvement with A.H. Thus, the court relied on R.C. 2151.414(E)(1), which states that :

Following the placement of the child outside the child's home and

notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

**{¶ 50}** The trial court's observations are well-supported in the record, by clear and convincing evidence, and the court's conclusions are not against the manifest weight of the evidence. The evidence indicates that during the pendency of the case, the parents made little or no use of rehabilitative services and material resources that were made available, and there was very little likelihood, in view of C.J.'s comments at the hearing, that the conditions causing the children to be removed would be remedied within a reasonable time. Instead, C.J. continued to use marijuana and have contact with A.H. – courses of conduct that had proven disastrous in the past. Accordingly, the Second Assignment of Error is overruled.

## IV. Best Interests of the Children

**{¶ 51}** C.J.'s Third Assignment of Error states that:

The Granting of Permanent Custody to GCCS Was Not in the Best Interest of the Children.

**{¶ 52}**   Under this assignment of error, C.J. contends that the factors in R.C. 2151.414(D) indicate that granting permanent custody to GCCS was not in the best interest of the children.    In this regard, C.J. argues that the children had a bond with him; that the children had not been in the agency's custody for at least 12 months of a consecutive 22 months; and that he believed he could provide a legally secure permanent home for the children.

**{¶ 53}**   R.C. 2151.414(D)(1) provides that:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether

that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 54}** We have previously held that " 'only one of the factors set forth in R.C. 2151.414(D) needs to be resolved in favor of the award of permanent custody in order for the court to terminate parental rights.' " *In re N.Q.*, 2d Dist. Montgomery No. 25428, 2013-Ohio-3176, ¶ 71, citing *In re Z.T.*, 8th Dist. Cuyahoga No. 88009, 2007-Ohio-827, ¶ 56. (Other citations omitted.)

**{¶ 55}** All the factors, not just one, weigh in favor of granting permanent custody to GCCS. The children have bonded very well with their foster mother, with whom they have lived a great deal of their lives. They have also bonded with her family, including her parents, whom they see frequently. The children are much healthier than when they came into the foster mother's care, and they are developmentally on target, as well as being loving and happy. Furthermore, although C.J. was described as being attentive and friendly to the children during visits, he had seen these very young children only four times in more than a year. There is no evidence that the children were bonded to him.

**{¶ 56}** Regarding the second factor, the children were too young to express their wishes. However, the GAL recommended that GCCS be given permanent custody.

**{¶ 57}** With respect to the custodial history, the children had been in the custody of GCCS more than a year, which was a significant portion of their lives; in fact, M.J. had only been in his mother's custody for about three months of his life, and neither child had even been in

C.J.'s custody.

{¶ 58}   Concerning the fourth factor, the children also needed a legally secure placement, and their foster mother wished to adopt both of them if GCCS received custody. There was no indication that permanent placement could be made without a grant of permanent custody to the agency.   As was noted, the record reveals no evidence that C.J. could provide a stable, permanent home for the children.

{¶ 59}   With respect to the factors in R.C. 2151.414(E)(7)-(11), GCCS argues that both R.C. 2151.414(E)(9) and (10) apply.   Factor (10) indicates that the parent has abandoned the child.   As was previously noted, we agree with the trial court that both parents abandoned the children.

{¶ 60}   Finally, R.C. 2151.414(E)(9) applies where:

The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

{¶ 61}   The record does not specifically indicate that C.J. placed the children at substantial risk of harm two or more times due to his drug abuse.   According to C.J.'s counselor, C.J. has had a long battle with marijuana abuse and addiction. C.J. also failed to complete case plan goals for treating his mental health and addiction issues.   However, C.J. was rarely around his children, and was in jail most of their lives.   Inferentially, C.J.'s actions placed the children at

risk due to his failure to obtain treatment and act as a parent should, but there is no evidence that C.J. actually placed the children at substantial risk of harm on two or more specific occasions. The absence of specifics on this factor, however, is irrelevant in view of the otherwise overwhelming evidence that a grant of permanent custody to GCCS is in the children's best interest.

{¶ 62}    Accordingly, the Third Assignment of Error is overruled.


V.   Conclusion

{¶ 63}    All of C.J.'s assignments of error having been overruled, the judgment of the trial court is affirmed.


. . . . . . . . . . . . .

FAIN, J. and HALL, J., concur.



Copies mailed to:

Brittany M. Hensley
Jennifer Getty
Marcy A. Vonderwell
Joan Ackerman
Hon. Robert W. Hutcheson