[Cite as *In re A.D.C.L.*, 2016-Ohio-1415.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

|   |   |
|---|---|
| IN THE MATTER OF: A.D.C.L. and K.L. | : |
| | : |
| | :     Appellate Case Nos. 2015-CA-19 and |
| | :     2015-CA-21 |
| | : |
| | :     Trial Court Case Nos. 21430015 and |
| | :     21430016 |
| | : |
| | :     (Domestic Relations Appeal) |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of April, 2016.

. . . . . . . . . . .

RHONDA K. MCKINNISS, Atty. Reg. No. 0069035, 631 Wagner Avenue, Greenville, Ohio 45331
     Attorney for Appellee-Darke County Children Services

JAY A. ADAMS, Atty. Reg. No. 0072135, 500 East Fifth Street, Dayton, Ohio 45402
     Attorney for Appellant-A.W.

LUCAS W. WILDER, Atty. Reg. No. 0074057, 120 West Second Street, 400 Liberty Tower, Dayton, Ohio 45402
     Attorney for Appellant-J.L.

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In these consolidated appeals, the biological mother, A.W., and the biological father, J.L., appeal from the termination of parental rights to their minor children, A.D.C.L. and K.L., and the grant of permanent custody to Darke County Children Services ("DCCS").[1]  Father presents two assignments of error: (1) that the decision that he abandoned his children is not supported by clear and convincing evidence; and (2) that the grant of permanent custody is not supported by clear and convincing evidence. Mother argues that the trial court erred in refusing to let her surrender her parental rights.

{¶ 2} We conclude that the trial court did not err in granting permanent custody to DCCS, as the court's findings as to abandonment and the best interests of the children are supported by sufficient evidence to meet the clear and convincing standard that is required in permanent custody cases.

{¶ 3} We further conclude that the trial court did not err in connection with Mother's desire to surrender her parental rights.   The statute urged at the trial court level was R.C. 5103.15, which applies to private transfers of custody, not neglect and dependency proceedings, which are adversarial and are governed by different statutes.   Mother also did not have the ability to surrender custody under R.C. 5103.15, because DCCS had already been granted custody.   The trial court, therefore, properly proceeded in compliance with the requirements in R.C. 2151.414.   In addition, even if Mother had made an admission (which she did not), the trial court was not required to accept or discredit it; such an admission would have been but one more article of testimonial

---

[1] For convenience, we will refer to the parents as "Father" and "Mother."   We will also shorten A.D.C.L.'s initials to "A.L."

evidence for the court to consider in resolving the best-interest question. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 4} In June 2014, DCCS filed a complaint in the Darke County Juvenile Court, alleging that A.L. was an abused child because Father had shot him in the stomach with a BB gun on June 5, 2014. The complaint further alleged that K.L. was dependent because she lacked adequate personal care due to the faults or habits or her parents, and also lived in a house where a parent had abused a sibling. The complaint did not allege that Father had intentionally shot A.L. According to the complaint, Father was moving the gun, was unaware it was loaded, and the gun discharged. The child was air-lifted to Children's Medical Hospital, where the BB was found to be lodged in the pancreas, and could not be removed. At the time of the incident, A.L. was three years old, and K.L. was four years old.

{¶ 5} After the complaint was filed, the children were placed with Mother. However, on July 2, 2014, Mother informed DCCS that she and Father had allowed alcohol to cause them to lose their means to support the children, and that they could not provide for the children. The parents asked DCCS to pick up the children, which was done on July 3, 2014. That day, DCCS asked the trial court to grant the agency temporary custody ex parte, and the court agreed.

{¶ 6} After a hearing, at which the parents consented to temporary custody, DCCS was granted temporary custody and an adjudication hearing was set for September 2014. In September 2014, DCCS filed a case plan outlining goals, including visitation once a

week at the agency for two hours. The visitation was to be supervised, due to the parents' limited parenting abilities and the volatile relationship of the parents with each other. The case plan noted that the parents had a history of mental health issues, of not complying with their medication, and of domestic violence with each other.

{¶ 7} Ultimately, the adjudication hearing was held on October 2, 2014, at which time Father appeared and admitted the allegations in the complaint. A.L. was found to be an abused child, and K.L. was found dependent. Mother did not appear for the hearing, and services were, therefore, not ordered for her at this time. Father was ordered to undergo a substance abuse assessment and to follow all recommendations; to maintain clean and suitable independent housing, with working utilities; to sign releases; to submit to random drug screens; to remain medication compliant; to complete a mental health assessment and comply with all recommendations; to attend parenting classes; to obtain and maintain a valid driver's license; to resolve all legal matters pending in other courts; and to maintain a source of income.

{¶ 8} In November 2014, the children were moved out of the county because they could not be maintained in their current foster home. Visitation was changed to once per month, at the paternal grandparents' home. At the time, it was noted there were no transportation obstacles, and that the foster parents and the grandparents would provide transportation.

{¶ 9} In December 2014, Mother voluntarily agreed to complete case plan services. She was given requirements similar to Father's, including obtaining a psychological assessment, a substance abuse assessment, an anger management assessment, and a parenting skills assessment, as well as following all recommendations

from the assessments. Mother was also to obtain and maintain suitable housing, to receive individual counseling and medication services, to undergo a budgeting skills program, and to obtain and maintain a source of income.

{¶ 10} The last time either parent visited the children was in January 2015. Mother, thereafter, did not stay in contact with the DCCS caseworker, nor did she schedule any visits or ask about the children. Father was permitted to have visits, but he did not follow up with setting them up.

{¶ 11} In late January 2015, Father tested positive for Benzodiazepines. He was also unsuccessful with his case plan. Although he completed a substance abuse assessment and attended a few groups, he did not complete the requirements. He also did not undergo a mental health assessment and was not compliant with his medication. Moreover, although Father had housing, it was extremely filthy and lacked heat and running water. The caseworker discussed the housing issues with Father numerous times, and he agreed the house was not suitable for children. The caseworker was last in Father's house in April 2015, and the conditions remained the same. She attempted to visit after that time, but Father was not home.

{¶ 12} The caseworker had sporadic contact with Mother between December 2014 and June 22, 2015. Mother did not complete the requirements on her case plan, and tested positive for marijuana in April 2015. In June 2015, neither parent attended the semi-annual case review.

{¶ 13} On June 8, 2015, DCCS filed a motion in the trial court, asking the court to award the agency permanent custody of the children, based on the parents' failure to visit or maintain contact with the children for more than 90 days. In July 2015, the Guardian

ad Litem ("GAL") filed a report recommending that the court grant permanent custody to DCCS. The GAL noted that the parents had shown no interest in the children and had not completed their case plan. The children were doing very well in their foster placement, and the foster parents were interested in adopting them.

{¶ 14} On July 30, 2015, the trial court held a permanent custody hearing. The testimony at the hearing was as outlined above. In addition, the foster father testified that when the children came into his care, they could not communicate and were similar to infants. After being in the care of the foster parents, the children had almost caught up to their age groups. The testimony also indicated that no relatives of the children were willing to accept custody.

{¶ 15} According to the evidence, in addition to the problems caused by the gunshot wound, A.L. had Duchenne muscular dystrophy and had no growth hormones. He also had a kidney problem, which was corrected shortly before the custody hearing. At the hearing, Father admitted that when he had visited his children, he rarely interacted with them. He also told the caseworker prior to the hearing that he did not want the children to come back into his custody. In addition, his parental rights had previously been terminated with respect to another child. In that case, he did not appear at the final hearing.

{¶ 16} Although Father claimed at the hearing that a number of the problems with his house had been rectified since April 2015, he stated that he never let the caseworker know. He also said that he had not seen the children because he had been involved in performing community service for common pleas court and doing recovery for his probation officer. Father stated that he had mental issues and could not do two things

at once. At the time of the hearing, he had recently had five unexcused absences in his drug and alcohol classes, and had not contacted his probation officer since the prior month, even though he was supposed to meet with her twice a week. In addition, Father said he had not set up a mental health assessment because he was overwhelmed.

{¶ 17} At the beginning of the permanent custody hearing, Mother's attorney indicated that Mother would like to voluntarily surrender her rights to the children. However, DCCS would not agree, and the court took the matter under advisement. During her testimony, Mother stated that she was seven to eight months pregnant (not with Father's child).

{¶ 18} After hearing the evidence, the trial court concluded that the parents had abandoned the children and that a grant of permanent custody to DCCS was in the children's best interests. The court further concluded that the statute which permitted voluntary surrender (R.C. 5103.15) required the agreement of both parties, and the court could not compel DCCS to agree. Both Mother and Father appealed the trial court's decision, and the appeals were consolidated.

II. Clear and Convincing Evidence of Abandonment

{¶ 19} Father's First Assignment of Error states that:

The Trial Court's Decision Awarding Permanent Custody on the Ground that Mr. L.* * * Had Abandoned His Children Was Not Supported by Clear and Convincing Evidence.

{¶ 20} Under this assignment of error, Father contends that R.C. 2151.011(C) creates only a presumption of abandonment, and that he rebutted the presumption by

other factors, including showing that he had cleaned up his trailer, that he was actively participating in group therapy sessions, that he had remained drug free, and that he held a bond with his children.

{¶ 21} As pertinent here, R.C. 2151.414(B)(1) states that:

* * * [T]he court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(b) The child is abandoned.

{¶ 22} Regarding abandonment, R.C. 2151.011(C) provides that:

For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.

{¶ 23} Some courts have indicated that "R.C. 2151.011(C) does not contain a requirement of any particular 'intent' on behalf of the parent; rather, the provision defines 'abandonment' solely in terms of the time between contacts." *In re D.P.*, 10th Dist. Franklin No. 06AP-780, 2007-Ohio-1703, ¶ 7. We have held, however, that the presumption is rebuttable. *See, e.g., In re M.J.*, 2d Dist. Greene No. 2014-CA-32, 2015-Ohio-127, ¶ 33, citing *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913. (Other citations omitted.)

{¶ 24} In *C.E.*, we found the presumption rebutted where a mother left the state and avoided contact with her children, in order to prevent her ex-husband, who had committed domestic violence, from finding her. *C.E.* at ¶ 15. We also stressed that no evidence had been presented contradicting the mother's testimony about why she failed to contact her children. *Id.*

{¶ 25} The applicable standard of proof in permanent custody cases is clear and convincing evidence, which has been defined as "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), syllabus. " 'An appellate court will not reverse a trial court's determination concerning parental rights and child custody unless the determination is not supported by sufficient evidence to meet the clear and convincing standard of proof.' " *In re Rishforth*, 2d Dist. Montgomery No. 20915, 2005-Ohio-5007, ¶ 11, quoting *In re Dylan C.*, 121 Ohio App.3d 115, 121, 699 N.E.2d 107 (6th Dist. 1997).

{¶ 26} In the case before us, neither Mother nor Father rebutted the presumption by giving any reasonable explanation for their failure to visit or contact their children. Mother stated that she did not see the children because she did not have her own home and had limited transportation. However, the visitation was not scheduled in Mother's home, and Mother made absolutely no attempt to request transportation assistance from DCCS.

{¶ 27} Father's "explanation" for his failure to visit or contact his children is that he

had been involved with community service, in doing recovery for his probation officer, and in trying to comply with the plan the DCCS had established. However, Father never told his caseworker that he felt overwhelmed. Even if he had felt overwhelmed, visitation once a month would not have required much effort on his part. Instead, Father went more than ten months (from January 17, 2015 to the date of the October 30, 2015 permanent custody hearing) without seeing or even attempting to contact his children. He also told the caseworker that he did not want the children to come back into his custody. The remaining matters Father mentions are more pertinent to the best interests analysis and will be considered during that discussion.

{¶ 28} Under the circumstances, there was sufficient evidence to meet the clear and convincing standard in connection with the finding that Father had abandoned his children. We also stress that we defer to trial courts on credibility issues, because they are in the best position to see witnesses and judge their credibility. *See M.J.*, 2d Dist. Greene No. 2014-CA-32, 2015-Ohio-127, at ¶ 35, and *In re J.D.*, 2d Dist. Montgomery No. 26588, 2015-Ohio-4114, ¶ 56.

{¶ 29} Accordingly, Father's First Assignment of Error is without merit and is overruled.


III. Whether Permanent Custody Is in the Children's Best Interests

{¶ 30} Father's Second Assignment of Error states that:

The Trial Court Erred in Awarding Permanent Custody Because There Was Not Clear and Convincing Evidence that Granting Permanent Custody Was in the Best Interest of the Child.

{¶ 31} Under this assignment of error, Father contends that the record lacks clear and convincing evidence that a grant of permanent custody was in the children's best interest. In this regard, he focuses on his bond with his children and the fact that visits had gone well; the lack of evidence about the children's wishes; the fact that the children had only been in DCCS's custody for 13 months; and the fact that he was substantially complying with his case plan.

{¶ 32} As was noted, R.C. 2151.414(B)(1) provides that the trial court may grant an agency permanent custody if children have been abandoned and the grant of custody is in the children's best interest. R.C. 2151.414(D) contains various factors to be considered in deciding a child's best interest. We have previously held that "while R.C. 2151.414(D) requires the court to 'consider all relevant factors' as set forth in this subsection, it does not require the court to list those factors or conditions it found applicable before making its determination that the permanent custody is in that child's best interest." (Citation omitted.) *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, ¶ 27.

{¶ 33} The trial court stated that it had considered all the factors in R.C. 2151.414(D). In its decision, the court placed particular reliance on the children's progress in foster care while they had no contact with the parents; the children's need for a legally secure placement, which could be achieved through a grant of custody to the agency; and the fact that the children had been abandoned. These are all appropriate factors under R.C. 2151.414(D).

{¶ 34} Furthermore, Father's contentions are not supported by the record. Although Father testified that he loved his children, there was scant evidence of a bond.

The children were very young when they were removed from the home, and by Father's own admission, he rarely interacted with them. During the infrequent visitations, the children played with each other, and Mother and Father primarily watched them play. At the last visitation in January 2015, Father had just been released from jail. He came to this visitation in his pajamas, slept, and did not interact with the children.

{¶ 35} The children were also very young, and there is no indication in the record that they reacted positively or were happy to see their parents during visitation; to the contrary, they were instead described as being very bonded with their foster parents and were, in the words of the caseworker, "always excited to see [the foster parents], be around them, play with them." October 30, 2015 Transcript of Proceedings, p. 24.

{¶ 36} Moreover, while the children had been in DCCS's custody for 13 months, Father failed to see the children during at least 10 of those months. Consequently, the length of time in custody is an insignificant point; more important is the fact that for most of the 13 months, Father made no attempt to visit or contact the children.

{¶ 37} Finally, Father did not substantially comply with his case plan. As an initial matter, he failed to secure clean and suitable housing. During the last visit of the caseworker in April 2015, Father's home was filthy and lacked running water and heat. Although Father claims that he subsequently cleaned up the house and had utilities, he never let the caseworker know, and never asked her to return to his home to see his progress. Furthermore, the trial court was not required to believe Father. As was noted, matters of credibility and the weight to be given witness testimony are primarily the province of the trier of fact. *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, at ¶ 22.

{¶ 38} Father also had never scheduled a mental assessment, had made minimal progress in substance abuse treatment (in the period just prior to the permanent custody hearing, he had five unexcused absences), and had not visited his children in ten months.

{¶ 39} Our review of the record indicates that the trial court's decision was supported by ample evidence to meet the clear and convincing standard of proof. *Rishforth*, 2d Dist. Montgomery No. 20915, 2005-Ohio-5007, at ¶ 11. Accordingly, Father's Second Assignment of Error is overruled.

IV.   Request to Surrender Parental Rights

{¶ 40} Mother's sole assignment of error states that:

The Trial Court Erred in Not Allowing Mother to Surrender Her Parental Rights to the Minor Children to Darke County Children Services.

{¶ 41} Under this assignment of error, Mother contends that the trial court abused its discretion by failing to let her voluntarily surrender her rights to the children.   Mother states that there is no case law on this point, but argues as a matter of public policy that a children services agency should not be permitted to force parents into situations where they are subject to a "reasonable efforts bypass" in the future simply because of past indiscretions.

{¶ 42} The statute upon which the parties relied in the trial court is R.C. 5103.15. This statute provides, in pertinent part, that:

(B)(1) Subject to * * * juvenile court approval, the parents, guardian,

or other persons having custody of a child may enter into an agreement with

a  public  children  services  agency  or  private  child  placing  agency

surrendering the child into the permanent custody of the agency. An agency that enters into such an agreement may take and care for the child or place the child in a family home.

A private child placing agency or public children services agency that seeks permanent custody of a child pursuant to division (B)(1) of this section shall file a request with the juvenile court of the county in which the child has a residence or legal settlement for approval of the agency's permanent surrender agreement with the parents, guardian, or other persons having custody of the child. Not later than fourteen business days after the request is filed, the juvenile court shall determine whether the permanent surrender agreement is in the best interest of the child. The court may approve the permanent surrender agreement if it determines that the agreement is in the best interest of the child and, in the case of an agreement between a parent and an agency, the requirements of section 5103.151 of the Revised Code are met. The agency requesting the approval of the permanent surrender agreement shall file a case plan, prepared pursuant to section 2151.412 of the Revised Code, with the court at the same time that it files its request for the approval of the permanent surrender agreement.

* * *

(C) The agreements provided for in this section shall be in writing, on forms prescribed and furnished by the department, and may contain any proper and legal stipulations for proper care of the child, and may authorize

the public children services agency or private child placing agency when such agreements are for permanent care and custody to appear in any proceeding for the legal adoption of the child, and consent to the child's adoption, as provided in section 3107.06 of the Revised Code. * * *

{¶ 43} R.C. 5153.16(A)(2) gives public children service agencies the power to "[e]nter into agreements with the parent, guardian, or other person having legal custody of any child, * * * with respect to the custody, care, or placement of any child, or with respect to any matter, in the interests of the child, provided the permanent custody of a child shall not be transferred by a parent to the public children services agency without the consent of the juvenile court * * *."

{¶ 44} The Supreme Court of Ohio has indicated that a permanent surrender consent proceeding under R.C. 5103.15 is a private transfer of custody that is distinct from neglect and dependency proceedings, which are adversarial and are governed by separate statutes. *See In re Miller*, 61 Ohio St.2d 184, 188-191, 399 N.E.2d 1262 (1980); *Angle v. Children's Services Div., Holmes Cty. Welfare Dept.*, 63 Ohio St.2d 227, 230, 407 N.E.2d 524 (1980). *Accord Ross v. Prater*, 2d Dist. Montgomery No. 16582, 1998 WL 655416, *3 (Sept. 11, 1998).

{¶ 45} "An agreement by a child's parents or legal guardian to surrender a child to the permanent custody of a certified association or institution described in R.C. 5103.15 constitutes a contract where accepted by such association or institution and when voluntarily made without fraud or misrepresentation." *Miller* at 189. Proceedings under R.C. 5103.15 are not adversary proceedings, and the juvenile court's "function in consenting to a permanent surrender [is] to insure that the surrender is made by the

parent voluntarily, with full knowledge of the legal import of the relinquishment of parental rights accomplished thereby; and to insure that the child welfare agency does not enter into improvident contracts." *Miller* at 191.

{¶ 46} Courts have also stressed that "[b]y the explicit terms of R.C. 5103.15(B)(1), an agreement to voluntarily place a child in the permanent custody of a children services agency may only be executed by parents 'having custody of a child[.]' " *In re A.P.*, 9th Dist. Medina No. 13CA0083-M, 2015-Ohio-206, ¶ 20, quoting R.C. 5103.15. The Ninth District Court of Appeals, therefore, concluded in *A.P.* that a father could not have surrendered his parental rights pursuant to this statute because at the time of the alleged surrender, the children services agency had temporary custody of the child. *Id.* *See also Adoption Link, Inc. v. Suver*, 112 Ohio St.3d 166, 2006-Ohio-6528, 858 N.E.2d 424, ¶ 9 (noting that parents lacked authority to surrender their parental rights to a private adoption agency under R.C. 5103.15, because the Clark County Department of Job and Family Services already had temporary custody of their child).

{¶ 47} In light of the preceding discussion, R.C. 5103.15 has no application to this action, which is an adversarial proceeding brought under statutes pertaining to neglect and dependency. In addition, Mother did not have custody at the time she mentioned surrendering her rights pursuant to R.C. 5103.15. We express no opinion whether R.C. 5103.15(B)(1) voluntary surrender may be used in conjunction with, or parallel to, a neglect or dependency proceeding, but voluntary surrender requires statutory procedure, an agreement, and parental custody. Thus, the trial court correctly held that it could not require DCCS to agree to a voluntary surrender under R.C. 5103.15.

{¶ 48} We note that in *Ross*, counsel for the agency told the court prior to the final

hearing that the parties had an agreement to consent to permanent custody. *Ross*, 2d Dist. Montgomery No. 16582, 1998 WL 655416, at *1. During her testimony, the mother additionally said that she did not want to contest the agency's motion. She then left the hearing. *Id.* In filing objections to the magistrate's decision, and on appeal, the mother contended that the magistrate failed to comply with R.C. 5103.15 and Juv.R. 38(B) concerning the voluntary surrender, She also argued that the magistrate failed to comply with Juv.R. 29(D). *Id.* at *2-3.

{¶ 49} We concluded that the " 'agreement' * * * proffered to the court through [mother's] testimony was insufficient to permit its approval by the court as a basis for voluntary surrender pursuant to R.C. 5103.15." *Id.* at *3. We further stated that:

> However, the court approved no agreement. Rather, the court proceeded to determine the matter before it, which was CSB's R.C. 2151.413 motion for permanent custody. That matter was entirely distinct from any voluntary surrender. *In re Miller* (1980), 61 Ohio St.2d 184, 399 N.E.2d 1262. The court followed the procedures for the motion before it that are set out in R.C. 2151.414.

*Ross* at *3.

{¶ 50} As in *Ross*, the trial court in the case before us proceeded to hear and decide the motion for custody by following the procedures set forth in R.C. 2151.414. We find no abuse of discretion in the court's approach, particularly since Mother lacked the ability to voluntarily surrender the children under R.C. 5103.15.

{¶ 51} In *Ross*, the mother also argued that the trial court should have complied with the requirements of Juv.R. 29(D) regarding admissions. We rejected this argument,

also.   We concluded that the mother had not made an admission for purposes of Juv. R. 29(D), because she did not tell the court that it would be in the best interests of the children for custody to be granted to the agency; instead, she said that she was not contesting the motion because " 'the children had been through too much.' "   *Id.* at *4.

{¶ 52} In the case before us, the discussion with the trial court consisted of statements of counsel, not testimony from Mother.   *See* July 30, 2015 Transcript of Proceedings, pp. 5-6.   After the trial court indicated that it would take the issue under advisement, the court proceeded with the hearing, allowing Mother to cross-examine witnesses and to fully present her case.   Mother also chose to testify, and in her testimony, she never admitted that the agency had a right to permanent custody or that it was in her children's best interests for the agency to be granted custody.   *Id.* at pp. 52-62.   Accordingly, as in *Ross*, we conclude that Mother did not make an admission.

{¶ 53} In *Ross*, we could also have rejected the mother's argument because her alleged admission was not made at an adjudicatory hearing to which Juv.R. 29 applies; it was made at a dispositional hearing.   *See, e.g., In re Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, 776 N.E.2d 510, ¶ 34 (2d Dist.) (noting that "Juv.R. 34, pertaining to dispositional hearings, does not require the court to engage in a colloquy with a parent in an R.C. 2151.414 proceeding, which this proceeding was, such as that required by Juv.R 29 at adjudicatory hearings.")

{¶ 54} In *Lakes*, we compared the adjudicatory phase, where trial courts are required by Juv.R. 29(D) to engage in a colloquy, to the acceptance of guilty or no contest pleas under Crim.R. 11.   *Id.* at ¶ 60-62.   We stressed that "[o]nce an allegation is found to be true in the adjudicatory stage, the case then moves to the dispositional phase, which

is governed by Juv.R. 34. The issue at that stage is the best interest and welfare of the child." *Id.* at ¶ 63, citing *In re Pryor*, 86 Ohio App.3d 327, 620 N.E.2d 973 (4th Dist.1993). *Accord In re R.A.*, 8th Dist. Cuyahoga No. 95589, 2011-Ohio-742, ¶ 12, and *In re Williams*, 10th Dist. Franklin No. 03AP-1007, 2004-Ohio-678, ¶ 8 (both holding that Juv.R. 29 does not apply to dispositional hearings in permanent custody cases).

**{¶ 55}** In this regard, we further noted in *Lakes* that:

> In a neglect case, the juvenile court may proceed to find neglect at the adjudication stage upon the admission of the parent charged. No other evidence is required, even when the standard is clear and convincing evidence. *In re Schmidt* (1986), 25 Ohio St.3d 331, 25 OBR 386, 496 N.E.2d 952. At the dispositional stage, however, other evidence is surely required to determine whether a particular placement is in the child's best interest. * * * The parent's "admission" that placement with another person is in the child's best interest thus lacks the conclusive effect of an admission of neglect at the adjudicatory phase.

> Lacking the effect of a plea to a charge, a parent's admission in a dispositional hearing that his or her child's best interest would be served by permanent placement elsewhere than with the parent is not a matter that requires protections similar to those in Juv.R. 29(D). The admission is but one more article of testimonial evidence for the court to consider in resolving the best-interest question. The court is entitled to credit the admission or discredit it, on the merits.

(Citation omitted.) *Lakes*, 149 Ohio App.3d 128, 2002-Ohio-3917, 776 N.E.2d 510, at

¶ 70-71.

{¶ 56} Thus, in the case before us, even if Mother had made an admission, the trial court was not required to accept her assertion, and could have disregarded it on the merits. In *Lakes*, we additionally focused on the fact that the trial court had conducted a full evidentiary hearing, where other evidence was presented. *Id.* at ¶ 72. Consistent with *Lakes*, a full hearing occurred in this case, and the evidence was more than sufficient to indicate that permanent custody should be granted to DCCS. Again, we stress that the trial court did not accept Mother's attempted surrender of her parental rights.

{¶ 57} We further observe that, as with Father, there was sufficient evidence to support the trial court's decision that Mother had abandoned the children and that an award of permanent custody to DCCS was in the children's best interests. Mother's conduct was quite similar to that of Father, except that she had even less contact with the agency and did virtually nothing to accomplish the case plan requirements. Accordingly, Mother's sole assignment of error is without merit and is overruled.

## V. Conclusion

{¶ 58} Father's First and Second Assignments of Error, and Mother's sole assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . .

FROELICH, J. and HALL, J., concur.


Copies mailed to:

Rhonda K. McKinniss
Jay A. Adams
Lucas W. Wilder
Matthew Joseph
Hon. Jason R. Aslinger