[Cite as *In re B.J.*, 2016-Ohio-7440.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| IN THE MATTER OF: | : | CASE NOS. CA2016-05-036 |
| B.J. & L.J. | : | CA2016-05-038 |
| | : | O P I N I O N<br>10/24/2016 |
| | : | |
| | : | |


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 15-D000005


David P. Fornshell, Warren County Prosecuting Attorney, Kathryn M. Horvath, 500 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services

Benjamin Ellis, 52 Marco Lane, Centerville, Ohio 45458, guardian ad litem

Maxwell Kinman, 423 Reading Road, Mason, Ohio 45040, for minor child, L.J.

Wright & Schulte, LLC, Shireen J. Hebert, 865 South Dixie Drive, Vandalia, Ohio 45377, for appellant, K.S.

Joshua G. Burns, 423 Reading Road, Mason, Ohio 45040, for appellant, D.J.


**HENDRICKSON, J.**

{¶ 1}  Appellants, the biological mother and father of B.J. and L.J., separately appeal from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of their sons to appellee, Warren County Children's Services ("WCCS" or "the agency).  For the reasons set forth below, we affirm the juvenile court's decision.

{¶ 2} On January 20, 2015, WCCS filed a complaint alleging that both L.J. (born January 8, 2015) and B.J. (born September 20, 2013) were dependent children and that L.J. was an abused child. The complaint indicated that when L.J. was born, he tested positive for opiates and suffered symptoms of withdraw. At this time, K.S. ("Mother") tested positive for opiates, cocaine, and oxycodone. The complaint further alleged that Mother and D.J. ("Father") used illegal drugs while caring for B.J., that they had both used heroin two days prior to L.J.'s birth, and that Mother had admitted to using heroin "every other day" since September 2014.

{¶ 3} L.J. and B.J. were removed from Mother's and Father's care following a shelter care hearing on January 20, 2015, and were placed in the agency's temporary custody. In March 2015, a case plan was adopted for the parties. The case plan required Mother and Father to (1) obtain a drug and alcohol assessment and follow through with any recommendations from the assessment, (2) submit to random drug screens, (3) obtain a mental health assessment and follow through with any recommendations from the assessment, (4) maintain contact with WCCS, and (5) complete parenting classes.

{¶ 4} On April 8, 2015, Mother and Father entered into stipulations resulting in L.J. being found a dependent and abused child and B.J. being found a dependent child. A dispositional hearing was conducted on April 15, 2015, and temporary custody was continued with the agency. During the pendency of the case, Mother and Father were granted supervised visitation with the children one time per week for two hours at a visitation center. However, on June 24, 2015, WCCS suspended Mother and Father's visitation for "cancelling at the last minute and not attending drug screens."

{¶ 5} Mother and Father made limited progress in meeting the goals of the case plan, and on December 30, 2015, WCCS moved for permanent custody of the children. In its motion, the agency contended the children had been abandoned by their parents, that the

children should not or could not be returned to Mother or Father within a reasonable time period, and that permanent custody was in the children's best interest. A hearing on the motion was scheduled for April 11, 2016. Three days prior to the hearing being held, the children's guardian ad litem ("GAL") filed his report recommending that permanent custody be granted. At the commencement of the permanent custody hearing, Father's attorney moved for a six-month extension of WCCS's temporary custody, or alternatively, for a continuance of the hearing. Mother's attorney also requested that the matter be continued. The requests for a continuance were denied, and the juvenile court heard testimony from the agency's caseworker, Mother, and Father.

{¶ 6} The caseworker testified that WCCS became involved in the case after receiving a referral that L.J. was a drug-exposed infant. WCCS obtained temporary custody of L.J. and B.J. on January 20, 2015, and a reunification case plan was created for the parties in March 2015. In June 2015, the caseworker was assigned to B.J.'s and L.J.'s case. At the time of the caseworker's involvement, Mother and Father had completed diagnostic assessments with the Talbert House and were undergoing treatment at that facility. Mother and Father had both been diagnosed with opiate dependency. As a result of their assessments, it was recommended that Mother engage in mental health counseling and intensive outpatient treatment ("I.O.P.") and Father engage in individual counseling and I.O.P.

{¶ 7} Mother and Father were engaged in services at Talbert House from June 2015 until the end of August 2015. During this time, Mother's and Father's attendance was "sporadic," although they were not discharged from treatment — an event that would have occurred had they missed more than three meetings. However, near the end of August 2015, Mother and Father left treatment at Talbert House, informing the caseworker that they were going to try to "get clean" on their own at home.

**{¶ 8}** The caseworker discussed alternative drug treatment options with Mother and Father and referred them to Solutions. Following an assessment, both Mother and Father were recommended for residential drug treatment and I.O.P. Both Mother and Father engaged in I.O.P. until beds became available at an inpatient treatment program. A bed became available for Mother at the Nova House near the end of November or early December 2015, and Mother entered treatment for detoxification. Mother "walked out" of treatment at Nova House on December 10, 2015, informing the caseworker that she felt she was "detoxed, and, clean, and, didn't need to be there." Although Mother indicated she was interested in re-engaging in I.O.P., to the caseworker's knowledge, Mother has not engaged in any treatment since leaving Nova House on December 10, 2015.

**{¶ 9}** Father entered residential treatment at Adam's Recovery Center in December 2015. After receiving treatment for "a couple [of] weeks," Father left Adam's Recovery Center, stating he had been exposed to drugs at the treatment center and "didn't feel as if it was right for his sobriety." Father returned to Solutions for treatment, but his attendance was sporadic. By the time of the permanent custody hearing, Solutions had required Father to restart the program.

**{¶ 10}** The caseworker stated that Mother and Father were given random drug tests throughout the course of the case. Both Mother and Father continued to test positive for cocaine, opiates, and marijuana. In March 2016, Father refused two drug screens, but admitted to the caseworker that he was using methamphetamine during this time. On April 6, 2016, about a week before the permanent custody hearing, Mother tested positive for amphetamines, methamphetamines, marijuana, and opiates, and Father tested positive for amphetamines, methamphetamines, and marijuana. Both Mother and Father denied using drugs around the time of the April 6, 2016 drug test, informing the caseworker that they were "clean" and the drug screen results should have been negative.

**{¶ 11}** The caseworker explained that throughout the pendency of the case, the parents struggled with maintaining contact with WCCS. The caseworker described various messages that she left with Mother and Father after unsuccessfully trying to visit with them at the home they shared with Father's great-grandfather. The caseworker explained Mother had briefly moved out of this residence in January 2016, and provided a different address and phone number. The caseworker was unable to contact Mother at this new residence, and Mother eventually moved back in with Father at Father's great-grandfather's residence. In March 2016, the caseworker learned Mother had been incarcerated from mid-February 2016, to mid-March 2016. Father also had several periods of incarceration throughout the pendency of the case.

**{¶ 12}** The caseworker testified that as part of Mother's and Father's case plan, they were referred to Beech Acres for purposes of engaging in a parenting class. As of the date of the permanent custody hearing, neither parent had completed a parenting class.

**{¶ 13}** Throughout the case, Mother and Father maintained housing at Father's great-grandfather's home. The caseworker visited the home and found the home had "the room" for the children, but the space dedicated for the children did not contain any beds. Mother and Father were both employed "off and on" throughout the pendency of the case. Mother worked at a couple of restaurants and Father was last employed at a container company from April 2015 until October 2015.

**{¶ 14}** The caseworker also testified that Mother and Father had initially been granted visitation with the children once a week. However, in June 2015, their visitation was suspended after they failed to engage in services or treatments. Mother and Father were informed their visitation would be reinstated after they had gone to all treatment sessions for three consecutive weeks and provided three consecutive negative random drug screens. Mother and Father failed to meet these requirements and, as a result, neither parent has

seen L.J. or B.J. since June 2015. According to the caseworker, the last contact either parent had with the children was around September 20, 2015, when Mother and Father sent B.J. a birthday gift.

{¶ 15} The caseworker stated B.J. and L.J. are doing well in their current foster home. When the children were first removed from Mother's and Father's custody, they were placed in the care of their paternal great-grandmother. They remained in their paternal great-grandmother's care until July 2015. They then spent two weeks with a foster family before being placed in their current foster home near the end of July 2015. The caseworker testified that L.J. and B.J. are bonded to their foster parents and the children are "developmentally on track." B.J. has made improvements in his speech and language since being placed with the foster family. The children's foster parents expressed an interest to the caseworker in adopting L.J. and B.J. if the agency's permanent custody motion were granted.

{¶ 16} Mother testified at the hearing that she currently has a job, no longer struggles with sobriety, and has been clean since the beginning of February 2016. She denied recently using drugs and contended that the results of her April 6, 2016 drug test were incorrect. Mother did admit, however, that she had been incarcerated twice since February 2016, and that one of her incarcerations was a result of "drug related" activities. Mother also admitted that since walking out of the residential treatment program at Nova House in December 2015, she has not received any substance abuse treatment. Mother expressed a willingness, however, to return to Talbot House and re-engage in I.O.P.

{¶ 17} Mother also admitted that although she had received a referral by WCCS to Beech Acres for parenting classes, she had not engaged in those classes. Mother stated she has not seen L.J. or B.J. since June 2015, when her visitation rights were suspended. However, Mother testified she sent B.J. a birthday gift around September 20, 2015, and sent both children Christmas gifts in December 2015. According to Mother, the Christmas gifts

were "sen[t] through" Father's grandmother.

{¶ 18} Father testified he is currently unemployed, but actively looking for work. He admitted to using methamphetamine in March 2016, but claimed he no longer struggled with sobriety. He denied using drugs at the beginning of April 2016, and stated that the results from a drug test taken on April 6, 2016, were inaccurate as he had not used amphetamines, methamphetamines, or marijuana. Father testified he restarted I.O.P. treatment at Solutions, and had completed 8 of the required 18 sessions.

{¶ 19} Father admitted he had not completed the recommended parenting classes. Father stated he had started taking parenting classes at Solutions while also engaged in group I.O.P. treatment. However, after he was removed from group I.O.P. sessions and placed in individual sessions, his treatment overlapped the time the parenting classes were offered. Father attended "like five (5) or six (6)" of the required "eight (8) o[r] nine (9)" parenting classes before scheduling conflicts required him stop attending the parenting classes.

{¶ 20} Father testified he has not seen B.J. or L.J. since his visitation rights were suspended in June 2015. However, Father stated he maintained contact with the children by sending B.J. a birthday gift around September 20, 2015, and sending both B.J. and L.J. Christmas gifts in December 2015. Father explained the Christmas gifts had been sent to his grandmother, the children's great-grandmother, even though Father knew the children were no longer residing with her, but had been placed in foster care.

{¶ 21} After hearing the foregoing testimony and considering the exhibits that were entered into evidence, including the parties' case plan, a January 19, 2016 social summary report prepared by WCCS, copies of messages left by the caseworker at Mother's and Father's residence asking them to contact her, and Mother's and Father's April 6, 2016 drug test results, the juvenile court denied Father's request for a six-month extension of the case

and granted WCCS's motion for permanent custody. In granting WCCS permanent custody, the court found by clear and convincing evidence that the children had been abandoned by Mother and Father and, even if they had not been abandoned, the children could not, and should not, be placed with Mother or Father within a reasonable period of time. The court also concluded it was in the children's best interest for permanent custody to be granted to the agency.

{¶ 22} Father timely appealed the juvenile court's decision, raising one assignment of error. Mother also timely appealed the juvenile court's decision, raising three assignments of error. For ease of discussion, we shall address Mother's first assignment of error and Father's sole assignment of error together.

{¶ 23} Father's sole assignment of error:

{¶ 24} THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY.

{¶ 25} Mother's first assignment of error:

{¶ 26} THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION FOR PERMANENT CUSTODY.

{¶ 27} In their respective assignments of error, Mother and Father contend the juvenile court erred in determining that the children could not be placed in their care within a reasonable period of time and that it was in the children's best interest for permanent custody to be granted. Mother further contends the juvenile court erred when it concluded that she abandoned L.J. and B.J.

{¶ 28} Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *In re K.W.*, 12th Dist. Butler No. CA2015-06-124, 2015-Ohio-4315, ¶ 11, citing *Santosky v.*

*Kramer*, 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). Clear and convincing evidence is that which will produce in the trier of fact a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford*, 161 Ohio St.3d 469, 477 (1954). "A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented*." In re S.U.*, 12th Dist. Clermont No. CA2014-07-047, 2014-Ohio-5166, ¶ 22, citing *In re Rodgers*, 138 Ohio App.3d 510, 520 (12th Dist.2000).

{¶ 29} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *In re D.K.W.*, 12th Dist. Clinton No. CA2014-02-001, 2014-Ohio-2896, ¶ 21. Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No. CA2015-04-033, 2015-Ohio-3709, ¶ 10. "Only one of those findings must be met for the second prong of the permanent custody test to be satisfied." *In re A.S.*, 12th Dist. Warren Nos. CA2015-12-112 and CA2015-12-113, 2016-Ohio-1580, ¶ 17.

{¶ 30} We begin our analysis by addressing the second prong of the test.

*Abandonment*

{¶ 31} R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."

{¶ 32} Here, the juvenile court found that Mother and Father had abandoned the children as contemplated by R.C. 2151.011(C). In finding the children abandoned, the court stated that "[t]he presents that Mother and Father purport to have sent the Children are deemed *de minimus* contact. Therefore, the Court finds by clear and convincing evidence that the minor Children have been abandoned by Mother and Father."

{¶ 33} Mother does not dispute that more than 90 consecutive days passed since she last visited or had contact with the children. Mother admits she has not seen the children since her visitations were suspended in June 2015, and that her only "contact" with the children occurred when she sent a birthday present to B.J. around September 20, 2015, and sent Christmas gifts to the children in December 2015.[1] Mother, nonetheless, contends that the evidence presented at the permanent custody hearing overcomes the presumption of abandonment.[2] She argues she "put forth enough evidence to make the presumption [of abandonment] disappear and to show no intent on [her] part to abandon [the] children." In support of her argument, Mother relies on *In re Custody of C.E.*, 2d Dist. Champaign No. 2005-CA-11, 2005-Ohio-5913.

{¶ 34} In *In re C.E.*, the Second District noted that "'abandonment' of a child has

---

1. The exact date the Christmas gifts were sent to B.J. and L.J. is unknown. Testimony from the hearing indicates the gifts were sent in "in December" sometime "around Christmas." Testimony also indicates that Mother and Father did not send the gifts to the children directly, or by way of WCCS. Mother and Father sent the gifts to the children's great-grandmother, presumably to have great-grandmother pass the gifts along to the children at their foster home. The record is clear that the children had been removed from their great-grandmother's care in July 2015.

2. Father does not challenge the juvenile court's finding that B.J. and L.J. are abandoned children.

been defined as any conduct on the part of the parent which evinces a settled purpose to forego all parental duties and relinquish all parental claims to the child." *In re C.E.* at ¶ 12, citing *Baker v. Rose*, 28 Ohio Misc. 200, 203 (1970). The court determined that abandonment, "as used in Chapter 2151, requires proof of intent to relinquish parental rights of custody permanently, not just temporarily." *Id.* at ¶ 2. Therefore, "although the presumption of abandonment established by R.C. 2151.011(C) was triggered when [a] mother failed to visit or maintain contact with [her] children for a period exceeding ninety days, the trial court could reasonably find * * * that the mother successfully rebutted that presumption" by showing she did not intend to permanently relinquish her custodial rights. *Id.* Given that the evidence demonstrated that the mother and her husband had issues of domestic violence, that mother left Ohio to avoid contact with her husband, and that mother "avoided contact with the children for a period of about four months solely because she wanted to avoid the possibility that her husband would be able to locate her," the Second District concluded that Mother had successfully rebutted the presumption of abandonment and it upheld the denial of a motion for permanent custody. *Id.* at ¶ 15-19.

{¶ 35} Unlike in *In re C.E.*, Mother did not present a reasonable explanation for her failure to maintain contact with the children. *See, e.g., In re M.J.*, 2d Dist. Greene Nos. 2014-CA-32 and 2014-CA-33, 2015-Ohio-127, ¶ 37 (finding father "had no valid reason for failing to maintain contact with [his] children"); *In re A.D.C.L.*, 2d Dist. Darke Nos. CA2015-CA-19 and 2015-CA-21, 2016-Ohio-1415, ¶ 26 (finding that mother and father failed to provide "any reasonable explanation for their failure to visit or contact their children"). Although Mother's visitation was suspended by WCCS, Mother was given the opportunity to have her visitation reinstated by complying with case plan services. Mother failed to make the necessary progress on her case plan from the time her visitation was suspended in June 2015, until the time of the permanent custody hearing in April 2016. Further, although Mother was no longer

able to visit the children after June 2015, Mother was not prohibited from otherwise maintaining contact with the children. Mother admitted to sending gifts to B.J. in September 2015 and December 2015, and to L.J. in December 2015. Mother, therefore, could have continued contact with the children after June 2015 through mail correspondence. She chose not to maintain contact with her children in this manner.

**{¶ 36}** Accordingly, under these circumstances, we find no error in the juvenile court's determination that the children had been abandoned as contemplated by R.C. 2151.011(C).

*Cannot be Placed with Parents Within a Reasonable Period of Time*

**{¶ 37}** Even if the children had not been abandoned by their parents, the evidence presented at the permanent custody hearing supports the juvenile court's finding that B.J. and L.J. cannot be placed with either Mother or Father within a reasonable period of time.

**{¶ 38}** R.C. 2151.414(B)(1)(a) provides that a juvenile court may grant permanent custody of a child to a movant if it finds by clear and convincing evidence that permanent custody is in the child's best interest and

> [t]he child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and *the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.*

(Emphasis added.)

**{¶ 39}** R.C. 2151.414(E) sets forth a nonexclusive list of factors the juvenile court shall consider in determining if "a child cannot be placed with either parent within a

- 12 -

reasonable period of time or should not be placed with the parents." The juvenile court need only find the existence of one of the enumerated factors. *In re D.C.*, 12th Dist. Fayette No. CA2015-03-006, 2015-Ohio-3178, ¶ 31. As relevant here, the juvenile court found the factors set forth in R.C. 2151.414(E)(1), (4), (10), and (14) met. These factors provide as follows:

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
>
> * * *
>
> (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
>
> * * *
>
> (10) The parent has abandoned the child.
>
> * * *
>
> (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.

Specifically, with respect to these factors, the juvenile court found that (1) "notwithstanding diligent efforts by the Agency, Mother and Father have not completed case plan services and have not visited with the Children since June 2015;" (2) "Mother and Father have

- 13 -

demonstrated a lack of commitment toward the Children by failing to regularly support, visit, or communicate with the Children when able to do so, or by other actions showing an unwillingness to provide an adequate home for them;" (3) "both Mother and Father have abandoned the Children;" and (4) "Mother and Father are unwilling to provide food, clothing, shelter, and other basic necessities for the Children as demonstrated by their lack of compliance with the lack of interest in accessing case plan services."

{¶ 40} Contrary to Mother's and Father's arguments, there was sufficient evidence presented to support these findings. The evidence supports the juvenile court's determination that Mother and Father failed to remedy the conditions that necessitated removal of the children. Despite reasonable case planning and diligent efforts by the agency, including accommodating both parents' requests for alternative drug treatment programs when they were dissatisfied with Talbert House program, neither Mother nor Father successfully completed treatment for their drug dependency. After leaving the Nova House in December 2015, Mother failed to re-engage in drug treatment. Father did return to Solutions for treatment after leaving Adam's Recovery Center, but his attendance was sporadic and he had to restart the program. Further, at the permanent custody hearing, both parents denied struggling with sobriety despite the fact that they had recently tested positive for amphetamines, methamphetamines, and marijuana.

{¶ 41} The record also supports the juvenile court's findings that the children were abandoned and that Mother and Father have demonstrated a lack of commitment toward the children. At the hearing, both Mother and Father admitted they had not completed the recommended parenting classes. Mother testified she had not started the classes despite being referred to Beech Acres. Father testified he had started parenting classes but stopped attending the classes due to scheduling conflicts. Further, both parents admitted they had not seen their children since their visitations were suspended in June 2015. Neither Mother

nor Father made sufficient progress in meeting the goals of the case plan in order to have visitation reinstated. After their visitation was suspended, the only contact Mother and Father had with the children was sending B.J. a birthday gift in September 2015, and sending B.J. and L.J. Christmas gifts in December 2015.

{¶ 42} Additionally, with respect to Mother's and Father's willingness to provide the basic necessitates for the children, the agency presented evidence that Mother and Father have "spotty" work histories. Mother and Father have been employed "off and on" throughout the case. Father's last job ended in October 2015, and he has since been unemployed. Mother has had a number of positions at various restaurants and was employed as of the date of the permanent custody hearing. However, as the juvenile court noted, Mother's ability to provide stable housing was of some concern as her "living arrangement with Father's great-grand[father] makes her dependent on her relationship with Father in order to have a place to live." Further, the home that Mother and Father share with Father's great-grandfather was not "set up" for the children, as the space dedicated for the children did not contain any beds.

{¶ 43} Accordingly, given the foregoing considerations, we find no error in the juvenile court's determination that L.J. and B.J. could not be placed with either Mother or Father within a reasonable period of time. We therefore turn our analysis to whether the grant of permanent custody to the agency was in the children's best interest.

*Children's Best Interest*

{¶ 44} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

> [T]he court shall consider all relevant factors, including, but not limited to the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-

- 15 -

home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

**{¶ 45}** Here, the juvenile court considered the best interest factors set forth in R.C. 2151.414(D)(1)(a)-(e) and determined it was in the children's best interest for permanent custody to be granted to WCCS. With respect to R.C. 2151.414(D)(1)(a), the evidence shows that although Mother and Father both expressed love for the children, they have not visited with the children since June 2015, and have failed to maintain contact with the children. In contrast, the evidence supports the juvenile court's finding that the children, since being placed in a foster-to-adopt home in December 2015, have bonded to their foster parents, are well cared for, and are developmentally on track. The children's foster parents have expressed an interest in adopting B.J. and L.J. if permanent custody were granted to the agency.

**{¶ 46}** With respect to the wishes of the child, as set forth in R.C. 2151.414(D)(1)(b), at the time of the permanent custody hearing, B.J. was less than three years old and L.J. was approximately 15 months old. The juvenile court noted in its decision that it had "relied on the GAL, who recommended that the motion for permanent custody be granted."

**{¶ 47}** In consideration of R.C. 2151.414(D)(1)(c), the juvenile court noted that B.J.

and L.J. have been in the custody of WCCS since January 20, 2015, the beginning of the case. The children, therefore, had been in the agency's custody for 11 months prior to the agency moving for permanent custody on December 30, 2015.

{¶ 48} As for R.C. 2151.414(D)(1)(d) and (e), the evidence supports the juvenile court's finding that B.J. and L.J. are in need of a legally secure permanent placement and that this need cannot be met without a grant of permanent custody to the agency. As the juvenile court noted, the children were abandoned by their parents, Mother and Father have not seen the children since June 2015, Mother and Father "continue to have issues with illegal drug use," and Mother and Father have made "little progress" on their case plan.

{¶ 49} Mother and Father both argue they were working towards completing the requirements of their case plan and that an extension of temporary custody would have allowed them to progress in meeting case plan objectives. However, the record reveals that as of the time of the permanent custody hearing, the children had been in the agency's custody for 14 months, and during this time period, neither Mother nor Father had completed any of the requirements of their case plan or addressed the concerns that led to the removal of the children from their care. Mother and Father had not completed treatment for their substance abuse issues, and in fact, both denied struggling with sobriety despite the fact that they had recently tested positive for amphetamine, methamphetamines, and marijuana. Further, neither Mother nor Father had completed the recommended parenting classes or demonstrated a commitment to maintaining contact with WCCS or their children. The juvenile court was entitled to consider Mother's and Father's lack of progress with the case plan in determining whether permanent custody was in the children's best interest. *See In re N.R.*, 12th Dist. Butler No. CA2007-12-314, 2008-Ohio-1993, ¶ 35, citing *In re Brofford*, 83 Ohio App.3d 869, 878 (10th Dist.1992) ("Noncompliance with a case plan is a consideration for the termination of parental rights"). The court was also entitled to find that an extension of

- 17 -

temporary custody was not in the children's best interest and that B.J.'s and L.J.'s need for legally secure permanent placement could only be met by granting WCCS permanent custody.

{¶ 50} Accordingly, in light of the foregoing, we find the juvenile court's decision to grant permanent custody of the children to WCCS was supported by clear and convincing evidence. Father's sole assignment of error and Mother's first assignment of error are, therefore, overruled.

{¶ 51} Mother's second assignment of error:

{¶ 52} THE TRIAL JUDGE ERRED WHEN HE ALLOWED THE GAL TO SUBMIT HIS RECOMMENDATIONS REGARDING THE BEST INTEREST OF THE MINOR CHILDREN.

{¶ 53} In her second assignment of error, Mother contends the juvenile court erred when, in considering the wishes of the children under R.C. 2151.414(D)(1)(b), the court considered the GAL's recommendation that permanent custody should be granted to WCCS. She also contends that the GAL's opinion should not have been considered as the GAL failed to perform a proper evaluation as prescribed under Sup.R. 48(D)(13) by failing to "observe the child[ren] with each parent." Finally, Mother contends the juvenile court violated her due process rights when the court considered the GAL's recommendations and "allowed the trial court go forward even though the GAL report was filed merely three days before trial."

*GAL's Recommendation of Permanent Custody*

{¶ 54} As set forth above, in determining whether permanent custody is in a child's best interests, the court must consider "[t]he wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child." R.C. 2151.414(D)(1)(b). In the present case, B.J. and L.J., less than three years old and

approximately 15 months old, respectively, were not mature enough to express their wishes. The court, in making a finding under R.C. 2151.414(D)(1)(b), noted that it "relied on the GAL, who recommended that the motion for permanent custody be granted." R.C. 2151.414(D)(1) provides that a court "shall consider *all* relevant factors" in determining whether permanent custody is in a child's best interest. (Emphasis added.) A relevant consideration for a juvenile court in awarding permanent custody is the recommendation of the children's GAL. After all, it is the role of GAL to "protect the interest of the child and 'assist a court in its determination of a child's best interest.'" *In re C.B.*, 129 Ohio St.3d 231, 2011-Ohio-2899, ¶ 14, citing R.C. 2151.281(B) and Sup.R. 48(B)(1). *See also In re Baby Girl Baxter*, 17 Ohio St.3d 229, 232 (1985) ("The role of [the] guardian ad litem is to investigate the ward's situation and then to ask the court to do what the guardian feels is in the ward's best interest"). We, therefore, find no error in the juvenile court's consideration of the GAL's recommendation that permanent custody be granted to WCCS.

### *Sup.R. 48(D)(13)*

{¶ 55} Mother also argues that the juvenile court erred in considering the GAL's recommendation that permanent custody be granted because the GAL failed to comply with Sup.R. 48(D)(13) by failing to observe B.J. and L.J.'s interaction with Mother and Father.

{¶ 56} Sup.R. 48 governs GALs in Ohio and "sets statewide standards regarding the appointment, responsibilities, training, and reporting requirements" of GALs. *Hunter-June v. Pitts*, 12th Dist. Butler CA2013-09-178, 2014-Ohio-2473, ¶ 18. Sup.R. 48(D)(13) outlines various responsibilities a GAL shall, at a minimum, perform, unless impracticable or inadvisable, in order to provide the trial court with relevant information and an informed recommendation regarding the children's best interest. *Id.* As pertinent to Mother's argument, such responsibilities include observing the child with each parent. Sup.R. 48(D)(13)(a).

**{¶ 57}** "Rules of Superintendence 'do not have the same force of statute or case law, but are rather purely internal housekeeping rules which do not create substantive rights in individuals or procedural law.'" *Pitts* at ¶ 19, quoting *Elson v. Plokhooy*, 3d Dist. Shelby No. 17-10-24, 2011-Ohio-3009, ¶ 40. Therefore, noncompliance with the rule is generally not grounds for reversal. *See In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 23; *Miller v. Miller*, 4th Dist. Athens No. 14CA6, 2014-Ohio-5127, ¶ 18. *But see Nolan v. Nolan,* 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, ¶ 22-27 (finding that a GAL's testimony and report should have been stricken where the GAL did not meet the minimum standards of Sup.R. 48[D][13]).

**{¶ 58}** In the present case, we find that the juvenile court did not err in considering the GAL's report or recommendation that permanent custody be granted. The GAL substantially complied with the standards of Sup.R. 48(D)(13) by either meeting with or interviewing the children's parents, foster parents, and paternal great-grandmother. Although it was impracticable for the GAL to observe B.J. and L.J. with Mother and Father because Mother's and Father's visitation was terminated, the GAL completed a home visit of Mother's and Father's residence and discussed the children's familial relationships with Mother and Father. As the GAL noted in its report, Mother and Father both discussed their relationship with the children and reflected on their past care and custody of B.J. Therefore, under the circumstances of this case, we find the GAL conducted a proper evaluation under Sup.R. 48(D)(13) and conclude the juvenile court did not err in considering the GAL's report or recommendation that permanent custody be granted to the agency.

*Timeliness of the GAL's Report*

**{¶ 59}** Mother also argues her due process rights were violated when the juvenile court considered the GAL's recommendations and "allowed the trial court go forward even though the GAL report was filed merely three days before trial."

**{¶ 60}** Local Rule 5(D)(3)(3) of the Warren County Court of Common Pleas, Juvenile Division, requires a GAL to submit a report "if required to do so by Ohio Supp.R. 48 or as ordered by the court." Sup.R. 48(F)(1) requires the report be made available to the parties "no less than seven days" before the permanent custody hearing. R.C. 2151.414(C), however, states that a "written report of the guardian ad litem of the child shall be submitted to the court prior to or at the time of the hearing * * *." Pursuant to the Supreme Court's holding in *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, syllabus, parties to a permanent custody proceeding, "have the right to cross-examine the guardian ad litem concerning the contents of the report and the basis for a custody recommendation."

**{¶ 61}** Here, it is undisputed that the GAL filed his report with the juvenile court on April 8, 2016, a mere three days before the permanent custody hearing. Appellant failed, however, to object to the untimely filing of the GAL's report. By failing to object, Mother has waived all but plain error on appeal. *Seymour v. Hampton*, 4th Dist. Pike No. 11CA821, 2012-Ohio-5053, ¶ 30-31; *In re Keltner*, 12th Dist. No. CA97-10-188, 1998 WL 468811, *8 (Aug. 10, 1998). Plain error is only found in "exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Goldfuss v. Davidson*, 79 Ohio St.3d 116 (1997), syllabus.

**{¶ 62}** In the present case, we do not find that the late filing of the GAL's report affected the underlying proceedings or rose to the level of plain error. The record reveals that the GAL was present at the permanent custody hearing and was therefore subject to cross-examination by Mother as to his report and recommendation. *See, e.g., In re Ch.O.*, 8th Dist. Cuyahoga No. 84943, 2005-Ohio-1013, ¶ 36.

**{¶ 63}** We further conclude that Mother's due process rights were not violated by the late filing of the GAL's report. Due process requires notice and the opportunity to be heard.

*Kranz v. Kranz*, 12th Dist. Warren No. CA2012-05-038, 2013-Ohio-1113, ¶ 16. Here, Mother had notice of the GAL's report and was given the opportunity to be heard on the contents of the report. Specifically, Mother was given the opportunity to cross-examine the GAL as to his report and his recommendation at the permanent custody hearing.

{¶ 64} Accordingly, for the reasons stated above, we find that the juvenile court was entitled to consider the GAL's report and recommendation of permanent custody. Mother's second assignment of error is overruled.

{¶ 65} Mother's third assignment of error:

{¶ 66} [MOTHER'S] DUE PROCESS RIGHT TO LEGAL COUNSEL WAS PREJUDICED BY THE INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 67} In her third assignment of error, Mother argues she was denied effective assistance of counsel. Specifically, Mother contends her trial counsel's performance was deficient for failing to file a motion for an extension of temporary custody pursuant to R.C. 2151.415. She asserts that had the juvenile court been presented with a "written, time-stamped motion for an extension of temporary custody, the Court would have been in a better position to consider [her] request for an extension of temporary custody at the pretrial and, ultimately, at trial."

{¶ 68} "A parent is entitled to the effective assistance of counsel in cases involving the involuntary termination of his or her parental rights." *In re L.J.*, 12th Dist. Warren No. CA2014-10-124, 2015-Ohio-1567, ¶ 33. In determining whether counsel was ineffective in a permanent custody hearing, a reviewing court must apply the two-tier test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). *In re G.W.*, 12th Dist. Butler No. CA2013-12-246, 2014-Ohio-2579, ¶ 12. The parent must show that counsel's performance was outside the wide range of professionally competent assistance *and* that counsel's deficient performance prejudiced the parent. *Id.* "[A] reviewing court need not determine whether

counsel's performance was deficient before examining the prejudice suffered by the [parent] as a result of the alleged deficiencies." *Id.* at ¶ 13. To show that she was prejudiced by her counsel's deficient performance, the parent must show that there is "a reasonable probability that but for * * * her counsel's alleged errors, the result of the proceedings would have been different." *In re L.J.* at ¶ 33. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the proceedings. *Id.*

{¶ 69} After carefully reviewing the record in this case, we find no merit to Mother's argument that she received ineffective assistance from her counsel. Mother cannot establish a reasonable probability of a different outcome but for counsel's alleged error in not filing a motion for an extension of temporary custody. *See id.* at ¶ 34. The record does not support Mother's contention that temporary custody would have been extended in this case if counsel had filed such a motion. At the time of the pretrial hearing and of the permanent custody hearing, Mother was not actively progressing in meeting the goals of her case plan. Mother was not enrolled in parenting classes or a treatment program for her drug dependency issues and she continued to test positive for a number of illegal substances. As discussed in our resolution of Mother's first assignment of error, B.J. and L.J. were in need of a legally secure permanent placement and such placement could not be achieved without the grant of permanent custody to the agency. Filing a motion for an extension of temporary custody under these circumstances would have been futile.

{¶ 70} We therefore find no merit to Mother's arguments and overrule her third assignment of error.

{¶ 71} Judgment affirmed.

M. POWELL, P.J., and RINGLAND, J., concur.