[Cite as *In re M.T.*, 2017-Ohio-1334.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


IN THE MATTER OF:                :

     M.T.                         :       CASE NO.   CA2016-11-100

                                  :       O P I N I O N
                                         4/10/2017
                                 :

                                 :


APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. 14-D000048


D. Joseph Auciello, 306 South Third Street, Hamilton, Ohio 45011, guardian ad litem

Gray and Duning, John C. Kaspar, 130 East Mulberry Street, Lebanon, Ohio 45036, for appellant, W.T.

David P. Fornshell, Warren County Prosecuting Attorney, Kirsten A. Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for appellee, Warren County Children Services


**HENDRICKSON, P.J.**

{¶ 1}   Appellant, the biological father of M.T., appeals from a decision of the Warren County Court of Common Pleas, Juvenile Division, granting permanent custody of M.T. to appellee, Warren County Children Services ("WCCS" or "the agency").   For the reasons set forth below, we affirm the juvenile court's decision.

{¶ 2}   On October 3, 2014, WCCS filed a complaint alleging that M.T., born January

8, 2012, was a dependent child. The complaint indicated that M.T. resided with Mother and Father, who were unable to provide M.T. with stable housing. The court held a shelter care hearing on the same day and placed M.T. in the temporary custody of WCCS. WCCS then placed M.T. with a foster family.

{¶ 3}   On December 26, 2014, Mother, Father, and WCCS agreed to certain factual stipulations resulting in the court finding M.T. a dependent child. The same month, the court adopted a case plan prepared by the agency. The goal of the case plan was reunification; it required Mother and Father to (1) obtain employment and stable housing, (2) stay drug and alcohol free, (3) comply with case management services including various parenting classes, and (4) maintain communication with WCCS and respond within 24 hours.

{¶ 4}   Mother completed a parenting class but did not complete any other case plan requirements. She did not maintain contact with WCCS or the child's guardian ad litem ("GAL"). She did not provide the agency with any means of contacting or locating her. Mother visited with M.T. in December 2014 and then never visited her again.

{¶ 5}   Unlike Mother, Father made some progress towards completing his case plan objectives. He completed a drug and alcohol assessment in March 2015, a parenting class in February 2016, and a bonding class. Father also visited M.T. during weekly two-hour supervised visits. On average, he missed about one visit per month but almost always called to cancel.

{¶ 6}   During these visits, Father and M.T. exhibited a bond and would engage in playing, which was mostly directed by M.T. They would also watch videos on Father's phone. While the visits were mostly positive, social workers and M.T.'s GAL were concerned by the lack of verbal interaction between Father and M.T.

{¶ 7}   Father made no progress on other aspects of his case plan. He failed to maintain contact with WCCS and the GAL. His case workers often had no means of locating

or communicating with him. And in the two years that this dependency case was pending, Father never resolved his issues with homelessness.[1]

{¶ 8} On August 8, 2016, WCCS moved for permanent custody of M.T. In its motion, WCCS alleged that M.T. had been in WCCS's temporary custody for more than 12 months of a consecutive 22-month period, that both parents had abandoned M.T., and that a grant of permanent custody to WCCS was in M.T.'s best interest.

{¶ 9} The court set the permanent custody motion for trial on November 7, 2016. On November 3, 2016, the GAL filed a written report recommending that the court grant permanent custody to WCCS. Father objected to the report because it was filed less than seven days before the trial. The court overruled Father's objection.

{¶ 10} At the permanent custody hearing, the juvenile court heard testimony from WCCS employees, the GAL, M.T.'s foster parent, and Father. A WCCS caseworker testified that she was assigned to the parents' case from May 2015 through August 2015. During that time, she attempted to contact or locate Mother, but was unsuccessful. She also repeatedly attempted to contact or locate Father. However, she was only successful in making contact if she went to Father's scheduled visitations with M.T. There, she would ask Father to contact her later to arrange a home study. Father never followed up with the caseworker. The next time the caseworker saw Father she asked why he did not contact her and he responded that he was too busy because he was "working a lot."

{¶ 11} The caseworker reported that Father tested positive for oxycodone following a random drug screen administered by WCCS. Father told the caseworker that he received oxycodone from a hospital visit because of a toothache. He showed the caseworker paperwork to that effect but the paperwork did not indicate he received oxycodone. Even so,

---

1. WCCS filed for and received two six-months extensions of temporary custody.

the caseworker testified that drug abuse was not the agency's primary concern with Father. Instead, the agency was most concerned about Father's inability to resolve his homelessness.

{¶ 12} The caseworker also testified that the agency was concerned that Father was continuing to have contact with Mother who by that time had clearly abandoned her daughter. Father told the caseworker he did not know Mother's location. However, the agency was aware that Father and Mother were observed together in pictures posted on Facebook.

{¶ 13} The caseworker testified that in the two years that Father visited with M.T., visitations never increased in time or quantity and were always supervised. Father attended most of his visits but would usually call and cancel one visit a month. The only time Father failed to appear at a visit without calling to cancel was in the month preceding the permanent custody hearing.

{¶ 14} Finally, the caseworker testified that prior to the filing of the permanent custody motion, no relatives ever came forward to attempt to take custody of M.T. However, after the agency filed the motion, Mother's sister contacted them to inquire about taking custody. WCCS performed a home study but determined the sister was unsuitable as she already had four children and did not have the financial resources to provide for M.T.

{¶ 15} A WCCS supervisor testified that she was familiar with Father and Mother before M.T.'s removal because the family was on the juvenile court's "ATTEND" docket. This docket involves families who have children with truancy issues and one of M.T.'s older half-siblings was having problems attending school. In 2012, the supervisor found the family living in "deplorable conditions" in a storefront in Franklin, Ohio. A year later, the supervisor found that they had moved into a house without electricity. As an alternative power source, the family was using the neighbor's electric supply via an extension cord rigged between the houses. The supervisor testified that since the family lived at these two residences, Father

had lived itinerantly, staying at different motels in the area and friends' homes.

{¶ 16} The GAL testified that through the pendency of the case he repeatedly attempted to contact Father and determine where he was residing so that he could inspect Father's living situation. He would call Father's phone and sometimes leave messages but Father would never call him back. In the two-year span of the case, the GAL could recall only one instance when Father initiated contact with him.

{¶ 17} Like the WCCS caseworker, the GAL testified that the only way to speak with Father was to wait until he arrived for his visits with M.T. The GAL testified that Father and M.T. appeared bonded during the visits. The GAL also shared the caseworker's concern that Father failed to engage verbally with his daughter during visits. When the GAL asked Father where he was living he received ambiguous responses. Father would not give the GAL a physical address.

{¶ 18} Ultimately, the GAL recommended that the court grant permanent custody of M.T. to the agency. He explained that while Father had completed some case plan services, his failure to make any effort to obtain stable housing revealed that he was not actually interested in reunification with his daughter.

{¶ 19} M.T.'s foster parent testified that M.T. was two years, eight months old when she came to live with her foster family and that she had a severe lice infestation that took many weeks to treat. M.T. was adjusting well in her home, which included three older children. M.T. referred to a foster sister as "sissy" and her foster parents as Mom and Dad, which she had started doing on her own. The foster mother said that she would like to adopt M.T.

{¶ 20} Father testified that he did not have his own residence and was staying at a friend's home. He admitted that he never provided an address to WCCS. He was working at a tree service earning about $800 a month after making child support payments. He

admitted he twice tested positive for oxycodone in drug screens administered by the agency but that in each instance the positive test was related to a medical issue. He said he went to the ER for a headache and had surgery to remove a tumor. He claimed he gave the agency medical records indicating that he received oxycodone for these issues.

{¶ 21} Father defended his actions in the preceding two years by pointing out that the case had been assigned to at least five different caseworkers. He claimed that he attempted to contact some of the caseworkers but that they would not call him back. He also said he asked one caseworker for extended visitation with M.T. but that nothing was done in response.

{¶ 22} After hearing the foregoing testimony and considering the state's exhibits, including the agency's case plans and the home study performed at Mother's sister residence, the juvenile court granted WCCS' motion for permanent custody. In granting WCCS permanent custody, the court found by clear and convincing evidence that M.T. was in the custody of WCCS, a public children services agency, for more than 12 months in a consecutive 22-month period, that Mother had abandoned M.T., and that M.T. could not be placed with Mother or Father within a reasonable period of time, or should not be placed with either of them. The court also concluded it was in M.T.'s best interest for permanent custody to be granted to the agency.

{¶ 23} Mother did not appeal. Father raises three assignments of error. We address Father's first two assignments of error together.

{¶ 24} Assignment of Error No. 1:

{¶ 25} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE CHILD COULD NOT BE PLACED WITH EITHER PARENT WITHIN A REASONABLE TIME OR SHOULD NOT BE PLACED WITH EITHER PARENT.

{¶ 26} Assignment of Error No. 2:

{¶ 27} THE TRIAL COURT ERRED IN FINDING, BY CLEAR AND CONVINCING EVIDENCE, THAT THE BEST INTERESTS OF THE CHILD, AS DEFINED BY THE FACTORS SET FORTH IN R.C. § 2151.414(D), REQUIRED GRANTING PERMANENT CUSTODY TO WARREN COUNTY CHILDREN SERVICES.

{¶ 28} Before a natural parent's constitutionally protected liberty interest in the care and custody of his child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer*, 455 U.S. 745, 769, 102 S.Ct. 1388 (1982); R.C. 2151.414(B)(1). An appellate court's review of a juvenile court's decision granting permanent custody is limited to whether sufficient credible evidence exists to support the juvenile court's determination. *In re M.B.*, 12th Dist. Butler Nos. CA2014-06-130 and CA2014-06-131, 2014-Ohio-5009, ¶ 6. A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *Id.*

{¶ 29} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. *In re G.F.*, 12th Dist. Butler No. CA2013-12-248, 2014-Ohio-2580, ¶ 9. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing, in part, the factors of R.C. 2151.414(D). *Id.* Second, the court must find that any of the following apply: (1) the child is abandoned, (2) the child is orphaned, (3) the child has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, (4) where the preceding three factors do not apply, the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, or (5) the child or another child in the custody of the parent from whose custody the child has been removed, has been adjudicated an abused, neglected, or dependent child on three separate occasions. R.C. 2151.414(B)(1)(a)-(e); *In re C.B.*, 12th Dist. Clermont No.

CA2015-04-033, 2015-Ohio-3709, ¶ 10. Only one of those findings must be met for the second prong of the permanent custody test to be satisfied. *Id.*

{¶ 30} In Father's first assignment of error he contests the juvenile court's finding that M.T. could not be placed with him or Mother within a reasonable time or should not be placed with either parent. However, Father does not dispute the trial court's conclusion that M.T. was in the temporary custody of the agency for more than 12 months of a consecutive 22-month period as of the date the agency filed for permanent custody. This finding was all that was necessary to satisfy the second prong of the permanent custody analysis. Accordingly, Father's argument is moot and we turn to Father's second assignment of error and our analysis of whether the grant of permanent custody to WCCS was in M.T.'s best interest.

{¶ 31} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing:

[T]he court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 32} The juvenile court considered the best interest factors set forth in R.C. 2151.414(D)(1)(a)-(e) and determined it was in M.T.'s best interest for permanent custody to be granted to WCCS. With respect to R.C. 2151.414(D)(1)(a), the juvenile court found that M.T. had adjusted to life with her foster family who wanted to adopt her. The juvenile court found that M.T.'s only chance to live a stable life was to be placed in the permanent custody of WCCS so that the agency could arrange for her adoption. We also note that M.T.'s interaction with Father was limited to weekly visits in a supervised facility environment.

{¶ 33} In consideration of R.C. 2151.414(D)(1)(b), the court indicated that it relied on the GAL's recommendation. The GAL observed M.T.'s positive interactions with her foster family and had great concern for Father's unwillingness to make the changes necessary to allow for reunification. The GAL observed that Father failed to improve his issues with housing and failed to follow instructions to communicate with the agency and the GAL. Finally, Father failed to take advantage of all his parenting time.

{¶ 34} In considering R.C. 2151.414(D)(1)(c), the juvenile court reviewed M.T.'s custodial history. The juvenile court found that M.T. had been in the agency's custody since October 3, 2014, the beginning of the case, and through the date of the decision on permanent custody. Accordingly, M.T. had been in the temporary custody of WCCS for 12 months or more of a consecutive 22-month period.

{¶ 35} With respect to R.C. 2151.414(D)(1)(d), the juvenile court found that M.T. needed a legally secure permanent placement and that this need could not be met without a grant of permanent custody to the agency. As the juvenile court noted, Mother abandoned M.T. Father simply could not offer any evidence that he could provide for M.T.'s basic needs, and he failed to remedy the conditions and behaviors that resulted in M.T.'s removal. Father was also unable to establish that he could be reunified with M.T. in any reasonable amount of time.

{¶ 36} Finally, with respect to R.C. 2151.414(D)(1)(e), the juvenile court found that Mother had abandoned M.T.

{¶ 37} We have carefully and thoroughly reviewed the evidence in this case and find that the juvenile court's determination regarding the best interest of M.T. was supported by clear and convincing evidence and was not against the manifest weight of the evidence. Father's argument on appeal is essentially that WCCS failed to facilitate reunification. In this respect, he points out that there were five different caseworkers assigned to the case through its two-year pendency. He also claims that he provided WCCS with suitable family placements who attempted to contact WCCS at the beginning of the case but received no response. Outside of Father's self-serving testimony, there was no evidence in the record to substantiate this claim.

{¶ 38} Any perceived shortcomings against WCCS are far eclipsed by Father's own failure to make any real effort to reunify with his daughter. We agree with the GAL's assessment that Father's actions indicated he was not interested in reunification. Father understood that reunification was ultimately dependent on his ability to maintain stable housing. The agency afforded him considerable time to achieve that goal and even obtained two extensions so Father could complete his reunification plan. Yet he failed to undertake any effort to obtain housing. Moreover, he failed to maintain contact with the agency or his daughter's GAL. Father was so elusive during the pendency of this case that WCCS and the GAL were forced to wait for him to appear at his weekly visits with M.T. If Father was concerned that WCCS caseworkers were not responsive to relatives seeking custody, or had any other concerns, he could have registered a complaint or asked to speak with a supervisor. But he admitted he did not.

{¶ 39} The juvenile court was entitled to consider Father's lack of progress with the case plan in determining whether permanent custody was in the child's best interest. See *In*

- 10 -

*re N.R.*, 12th Dist. Butler No. CA2007-12-314, 2008-Ohio-1993, ¶ 35 ("Noncompliance with a case plan is a consideration for the termination of parental rights"). Considering the foregoing, we find the juvenile court's decision to grant permanent custody of M.T. to WCCS was supported by clear and convincing evidence. Father's first and second assignments of error are overruled.

{¶ 40} Assignment of Error No. 3:

{¶ 41} THE TRIAL COURT ERRED IN CONSIDERING THE REPORT AND RECOMMENDATION OF THE GUARDIAN AD LITEM WHEN IT DID NOT COMPLY WITH [SUP.R.] 48, IN VIOLATION OF THE DUE PROCESS RIGHTS OF FATHER.

{¶ 42} Father argues that the trial court erred in considering the GAL's report, which was filed four days before the hearing date of November 7, 2016. Father argues that the rules governing guardian ad litems required the GAL to file the report at least seven days before the hearing. Father argues that the late filing prejudiced him and denied him due process of law.

{¶ 43} Per Sup.R. 48(F), a GAL shall prepare a final written report detailing the GAL's recommendations, as well as any "activities performed, hearings attended, persons interviewed, documents reviewed, experts consulted and all other relevant information considered by the guardian ad litem in reaching the guardian ad litem's recommendations * * *." Sup.R. 48(F)(1)(c) provides, "unless waived by all parties or unless the due date is extended by the court, the final report shall be filed with the court and made available to the parties for inspection no less than seven days before the dispositional hearing."

{¶ 44} The Rules of Superintendence for the Courts of Ohio do not have the same force of statute or case law; they are internal housekeeping rules that do not create substantive rights in individuals or procedural law. *In re B.J.*, 12th Dist. Warren Nos. CA2016-05-036 and CA2016-05-038, 2016-Ohio-7440, ¶ 57. Therefore, noncompliance with

the rules is generally not grounds for reversal. *Id.* However, Father is arguing that the GAL's noncompliance resulted in a denial of his due process rights to the care custody, and management of his child.

{¶ 45} "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.'" *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054 (2000); see also the Due Process and Remedies Clauses, Article I, Section 16 of the Ohio Constitution. The liberty interest of parents in the care, custody, and management of their children is perhaps the oldest of the fundamental liberty interests recognized by the United States Supreme Court. *Troxel* at 65. The essential components of due process are notice, hearing and the opportunity to be heard before a competent tribunal. *Denier v. Denier-Carnes*, 12th Dist. Warren Nos. CA2016-02-012 and CA2016-04-022, 2017-Ohio-334, ¶ 21. The court must afford parties ample opportunity in appropriate cases to defend, enforce, or protect their rights through the presentation of their own evidence, confrontation and cross-examination of adverse witnesses, and oral argument. *Id.*

{¶ 46} During a pretrial discussion, the court asked the parties if they had received a copy of the GAL's report. All parties confirmed they had. Father's counsel then objected on the basis that the report was not filed at least seven days prior to trial. The court overruled the objection.

{¶ 47} Father does not explain how he suffered prejudice or was unable to offer a defense because of the GAL's untimely filing. The report was filed four days prior to the hearing and indicates it was hand-delivered to Father's counsel the day of filing. The report is ten double-spaced pages. Thus, it is not voluminous. There is nothing in the record that would indicate that Father's counsel could not adequately defend Father's rights because of the timing of receiving the report.

{¶ 48} Perhaps most importantly for purposes of due process, the GAL testified.

Father's counsel had the opportunity to and did cross-examine the GAL. The GAL's testimony was consistent with and essentially duplicative of much of the content of the report. Finally, there is no indication in the record or in Father's argument on appeal that any particular portion of the report caused Father to be unprepared to oppose the agency's permanent custody motion. Accordingly, we conclude that Father has not demonstrated a denial of his due process rights on the basis that the court considered the GAL's report. Accordingly, we overrule Father's third assignment of error.

{¶ 49} Judgment affirmed.

RINGLAND and M. POWELL, JJ., concur.